**Bill PRYOR, Attorney General for the State of Alabama, and the State of Alabama, Plaintiffs,**

v.

**Janet RENO, Attorney General of the United States, and the United States of America Defendants.**

Civil Action No. 97–D–1396–N.

United States District Court,
M.D. Alabama,
Northern Division.

March 13, 1998.

Jack M. Curtis, Dept. of Public Safety, Billington M. Garrett, Office of Attorney General, Montgomery, AL, for Plaintiffs.

Leura J. Garrett, Asst. U.S. Atty, Montgomery, AL, Frank W. Hunger, Asst. Atty. Gen., Dept. of Justice, Vincent M. Garvey, Dept. of Justice, Washington, DC, for Defendants.

## MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

On September 18, 1997, Plaintiffs Bill Pryor, Attorney General for the State of Alabama, and the State of Alabama (referred to collectively as "Plaintiffs," "Alabama" and "the State") filed this action, seeking (1) a declaratory judgment that the Driver's Privacy Protection Act of 1994, 18 U.S.C. §§ 2721–25, is unconstitutional under the Tenth and Eleventh Amendments to the United States Constitution, and (2) a prelimi-

nary and permanent injunction prohibiting Defendants Janet Reno and the United States (referred to collectively as "Defendants" and "the United States") from enforcing the Act in whole or in part.[1] Plaintiffs filed a Motion for Summary Judgment on December 22, 1997. Defendants filed a Motion to Dismiss on January 5, 1998, which, pursuant to Fed.R.Civ.P. 12(b), the court construes as a Motion for Summary Judgment, as well.[2]

■ After careful consideration of the arguments of counsel, the relevant law and the record as a whole, the court finds that Plaintiffs' Motion for Summary Judgment is due to be denied, and Defendants' Motion for Summary Judgment is due to be granted. Accordingly, Plaintiffs' Motion for Preliminary Injunction is due to be denied as moot. This Memorandum Opinion and Order disposes of all matters before the court.[3]

1. On December 17, 1997, Plaintiffs filed an Amended Complaint and Motion for Preliminary Injunction.

2. Rule 12(b) states that, if, on a motion to dismiss for failure to state a claim upon which relief can be granted, "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(b).

 Defendants filed a Memorandum in Support of Motion to Dismiss and Opposition to Plaintiff's Motion for Summary Judgment on January 5, 1998, wherein Defendants included citations to excerpts of Congressional testimony. Plaintiffs filed a Response to Defendants' Motion to Dismiss on January 20, 1998. Defendants filed a Reply to Plaintiffs' Response on January 27, 1998. Further, Plaintiffs filed a Brief in Support of their Motion for Summary Judgment on December 23, 1997, to which Defendants' January 5, 1998 Memorandum also replied. As Plaintiffs' own Motion for Summary Judgment refutes the contentions asserted in Defendants' Motion to Dismiss, the court finds that Plaintiffs have had a "reasonable opportunity" to present all material pertinent to Defendants' Motion to construe it as a Motion for Summary Judgment. Fed.R.Civ.P. 12(b).

 In addition, Defendants filed an Opposition to Plaintiffs' Motion for a Preliminary Injunction on January 5, 1998. On December 19, 1997, the court entered an Order setting a hearing on Plaintiffs' Motion for Preliminary Injunction for February 13, 1998. The court further Ordered a briefing schedule on Plaintiffs' Motion. Plaintiffs

## BACKGROUND

The Driver's Privacy and Protection Act of 1994 ("DPPA" or "the Act"), 18 U.S.C. §§ 2721, *et seq.*, regulates the sale, dissemination and use by the State and private individuals of personal information contained in State motor vehicle records.[4] The Act prohibits "a State department of motor vehicles, and any officer, employee, or contractor, thereof, [from] knowingly disclos[ing] or otherwise mak[ing] available to any person or entity personal information about any individual obtained by the department in connection with a motor vehicle record." 18 U.S.C. § 2721(a). It makes it unlawful for a State department of motor vehicles, and any officer, employee, or contractor thereof, to knowingly disclose or otherwise make available personal DMV information for any purpose other than a "permissible use." 18

filed a Brief in Support of Plaintiffs' Motion for a Preliminary Injunction on January 20, 1998. Defendants filed a Response to Issues Raised in Plaintiffs' Reply in Support of Motion for Preliminary Injunction on January 27, 1998. On February 9, 1998, the court, having been fully briefed on the matters pending in Plaintiffs' Motion for Preliminary Injunction, entered an Order canceling the Hearing set for February 13, 1998.

3. The elements of a permanent injunction and a preliminary injunction are similar, the sole exception being that the movant must actually prevail, as opposed to showing a likelihood of success on the merits, in order to receive a permanent injunction. *See e.g., Statewide Detective Agency v. Miller,* 115 F.3d 904, 905 (11th Cir. 1997); *Shatel Corp. v. Mao Ta Lumber and Yacht Corp.,* 697 F.2d 1352, 1354–55 (11th Cir. 1983). Having been extensively briefed on the merits of all relevant issues, the court properly resolves the merits of this action.

4. The statute defines a "motor vehicle record" as:

 any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles.
 18 U.S.C. § 2725(1).

 The DPPA defines "personal information" as: information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the five-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status.

U.S.C. § 2721(b).[5] State departments of motor vehicles with a "policy or practice of substantial noncompliance" with the Act's provisions are subject to a civil penalty of up to $5,000 a day for each day of substantial noncompliance, to be imposed by the United States Attorney General. 18 U.S.C. § 2723(b). Persons who knowingly violate the Act are subject to criminal fines. 18 U.S.C. § 2723(a).

The DPPA also regulates private individuals' sale or disclosure of the above information. The Act prohibits authorized recipients of personal DMV information from reselling or redisclosing personal information for a use for which the state could not have disclosed it in the first place. 18 U.S.C. § 2721(c); 18 U.S.C. § 2722(a). The Act requires that individuals reselling or redisclosing personal information for a permissible use keep records for five years stating to whom they have resold or redisclosed the information and the purpose of any such release, and must make these records available to the state department of motor vehicles upon request. 18 U.S.C. § 2721(c). Furthermore, the Act bars any person from knowingly obtaining personal DMV information for any unauthorized use, 18 U.S.C. § 2722(a), and from obtaining personal information "by false representation," 18 U.S.C. § 2722(b). Individuals who knowingly violate these provisions are subject to criminal fines, 18 U.S.C. § 2723(a), and private rights of action by the person to whom the personal information pertains. 18 U.S.C. § 2724.

The Act does permit disclosure or use of personal DMV information in several contexts, 18 U.S.C. § 2721(b)(1)–(14), and allows states to establish waiver procedures to handle requests for disclosures that do not fall within these exceptions. 18 U.S.C. § 2721(d). The DPPA allows states to release personal information for any use not included in the Act's list of permissible uses, if the motor vehicle department provides individuals an opportunity to prohibit such disclosure. 18 U.S.C. § 2721(b)(11). Also, departments of motor vehicles are permitted to release personal information for "bulk distribution" for surveys, marketing or solicitations if individuals have an opportunity to prohibit such disclosures. 18 U.S.C. § 2721(b)(12).

According to Defendants, Congress's purpose in enacting the DPPA was two-fold. First, Congress enacted the DPPA as a means of regulating the sale of personal DMV records for use in direct marketing, as numerous states sell or give personal information to data-base compilers, who use it in compiling targeted mailing lists sold or rented to direct marketers and individual companies to target customers nationwide. (Defs.' Mem. in Supp. Mot. to Dis. and in Opp. to Pls.' Mot. for Summ. J. ("Defs.' Mem. in Supp.") at 3–4.) As Defendants note, in considering the Act, Congress heard testimony on the way in which motor vehicle information is used in direct marketing. *See* 1994 WL 212834, Statement of Mary J. Culnan.

As Defendants assert, Congress also sought to regulate the disclosure and dissemination of personal DMV records in order to protect the privacy and safety of individuals. (Defs.' Mem. in Supp. at 4–5.) For example, as Defendants note, during testimony on the

---

18 U.S.C. § 2725(3).

5. The Act allows for the disclosure of personal information in abundant circumstances. 18 U.S.C. § 2721(b). For example, such information may be disclosed for use by any government agency in carrying out its functions, *id.* § 2721(b)(1); in connection with car or driver safety, theft and other motor-vehicle related matters, *id.* § 2721(b)(2); for use in the normal course of business by a legitimate business in certain instances, *id.* § 2721(b)(3); for use in connection with any civil, criminal, administrative or arbitral proceedings in any Federal, State, or local court or agency or before any self-regulatory body, *id.* § 2721(b)(4); for use in research activities, and for use in producing statistical reports, so long as the personal information is not published, redisclosed, or used to contact individuals, *id.* § 2721(b)(5); for use by an insurer or insurance support organization, or by a self-insured entity, or its agents, employees, or contractors, in connection with claims investigation activities, antifraud activities, rating or underwriting, *id.* § 2721(b)(6); for use in providing notice to owners of towed or impounded vehicles, *id.* § 2721(b)(7); for use by any licensed private investigative agency or licensed security service for any purpose permitted under the Act, *id.* § 2721(b)(8); for use by an employer or its agent or insurer to obtain or verify required information relating to a holder of a commercial driver's license, *id.* § 2721(b)(9); and for use in connection with the operation of private toll transportation facilities, *id.* § 2721(b)(10).

DPPA, Congress learned that, nationwide, criminals have used motor vehicle records to locate victims and commit crimes, as private citizens' addresses and phone numbers are easily accessible through such records. (Defs.' Mem. in Supp. at 4–5.)[6] During floor debate on the Senate version of the Act, Senators invoked the example of Rebecca Shaeffer, an actress from California, who was murdered by an obsessed fan who obtained her address from the department of motor vehicles through a private investigator. *See* 139 Cong. Rec. S15766, Comments of Senator Harkin.

Alabama contends that, in enacting the DPPA, Congress has exceeded its authority under the Tenth and Eleventh Amendments. Specifically, the State contends that the DPPA is an unconstitutional federal directive requiring the State of Alabama, through its state executive officers and legislature, to administer a federal program, which infringes on the State's sovereign right to legislate and regulate its citizens, in violation of the Tenth Amendment. The State further contends that the penalties imposed by the Act for noncompliance violate the Eleventh Amendment. Defendants challenge Plaintiffs' standing to bring this suit, and assert that the DPPA passes constitutional muster.

### *SUMMARY JUDGMENT STANDARD*

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *see also Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions in the file, together with affidavits, if any,'" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323. Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324; *see also* Fed.R.Civ.P. 56(e).

In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). That

---

**6.** Citing 1994 WL 14167988 (Feb. 4, 1994)(statement of Rep. Moran); 1994 WL 14168013 (Feb. 3, 1994)(statement of David Beatty); 1994 WL 14168055 (Feb. 3, 1994)(statement of Donald H. Cahill); 139 Cong. Rec. S15,762 (Nov. 16, 1993)(statement of Sen. Boxer); 139 Cong. Rec. S15,765 (Nov. 16.1993)(statement of Sen. Robb); 139 Cong. Rec. S15,765 (statement of Sen. Biden).

party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(c); *Matsushita*, 475 U.S. at 587. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita*, 475 U.S. at 587; *see also Anderson*, 477 U.S. at 249.

## DISCUSSION

### I. STANDING

██ Article III of the Constitution restricts the jurisdiction of the federal courts only to those disputes in which there is an actual "case" or "controversy." *See Raines v. Byrd*, —— U.S. ——, 117 S.Ct. 2312, 2317, 138 L.Ed.2d 849 (1997). An essential element of the case-or-controversy requirement is that Plaintiffs have standing to sue. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Allen v. Wright*, 468 U.S. 737, 750–51, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

██ To have standing, the plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474–75, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). The alleged injury must be "distinct and palpable," and not "abstract," "conjectural," or "hypothetical." *Allen*, 468 U.S. at 751 (citations omitted).

██ In a case such as this, where the court is asked to determine the constitutionality of legislation, the court's standing inquiry is especially rigorous. *Raines*, 117 S.Ct. at 2317. Thus, before considering the merits of the case, and before considering Plaintiff's request to issue a preliminary injunction, the court must determine whether Plaintiffs have met their burden of establishing that their claimed injury is personal, particularized, concrete, and otherwise judicially cognizable. *Raines*, 117 S.Ct. at 2317. Plaintiffs must at least establish that they have suffered an injury in fact—namely an "invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560.

██ Plaintiffs assert two grounds on which the court may find it has standing to bring the instant action. First, Plaintiffs contend that the State has standing to protect the "continued enforceablility of its own statutes." (Pls.' Br. in Supp. of Mot. for Summ. J. at 5.) Specifically, Plaintiffs contend that the DPPA conflicts with the State's present disclosure laws, namely Alabama Code §§ 32–6–14, 32–7–4 and 36–12–40.

Alabama Code § 36–12–40, the "Open Records Act," states, in relevant part:

> Every citizen has a right to inspect and take a copy of any public writing of this state, except as otherwise expressly provided by statute.

Ala.Code § 36–12–40 (1975). Plaintiffs contend that "[f]or Alabama Department of Motor Vehicle officials to comply with the DPPA, they must violate the letter and spirit of the Alabama 'Open Records Act' which requires public writings be made available to the public." (Pls.' Br. in Supp. of Mot. for Summ. J. at 5.)

Defendants contend that the DPPA does not, in fact, conflict with the Open Records Act, as Alabama courts have repeatedly recognized that the provision does not demand disclosures that will "result in undue harm or embarrassment to an individual or where the public interest will clearly be adversely affected, when weighed against the public policy considerations suggesting disclosure." (Defs.' Mem. in Supp. at 11) (quoting *Chambers v. Birmingham News Co.*, 552 So.2d 854, 856 (Ala.1989).) Plaintiffs contend, and the court finds, that no Alabama court has deemed the information contained in the DMV records to be an exception to the Open Records Act. Accordingly, the court finds that Plaintiffs have established standing on this basis. *See Oklahoma v. United States*, 994 F.Supp. 1358, 1364 (W.D.Okl.1997) (finding that Plaintiff established standing based on the DPPA's conflict with the Oklahoma Open Records Act).

██ In addition and in the alternative, the court finds that the State has shown that the

DPPA imposes "substantial costs" on the State minimally sufficient to establish its standing to bring suit. Plaintiffs contend that "[f]ollowing the DPPA's restrictive disclosure guidelines requires development of a new regulatory scheme and the training of DMV staff in its effect and operation," resulting in the State incurring "substantial, tangible costs." (Pls.' Brief in Supp of Pls.' Resp. to Order to Show Cause and Defs.' Mot. to Dismiss at 3.) In support of this contention, Plaintiffs offer the Affidavit of L.N. Hagan, the Director of the Alabama Department of Public Safety, stating, in relevant part:

2. The DPPA would impose substantial cost and labor on the Department of Public Safety if compliance with the Act is required.

\* \* \* \* \* \*

6. The implementation of DPPA would require the expense of training personnel about what information may be released, to whom and for what purpose. We would also need to retain personnel about the opt-out provisions for license renewals and new licenses.

7. Since the DPPA carries both criminal and civil penalties for personnel who release information on drivers licenses, training would have to be thorough and detailed. My staff estimates the cost of training to be $16,520.

8. There is no question, if DPPA is fully implemented by the State of Alabama, the Act will impose substantial expense and labor on the officers and employees of the Department of Public Safety.

(Pls.' Amend. Compl., Ex. A, Hagan Aff. ("Hagan Aff.").)

Based on this Affidavit, the court finds that the State has shown that it will suffer the incursion of costs *minimally* sufficient to establish standing to bring this suit. *See Condon v. Reno,* 972 F.Supp. 977, 981 n. 12 (D.S.C.1997)(finding that evidence contained in the "unrebutted affidavit" of a Department of Motor Vehicles official that implementation of the DPPA would "impose substantial costs and effort on the part of the Department in order for it to achieve compliance" meets the requirements for standing).

Accordingly, the court finds that the State has standing to bring the instant suit.

## II. *Tenth Amendment*

The Tenth Amendment provides: "The Powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. In this way, "the constitution divides authority between federal and state governments for the protection of individuals," and ensures that our system of federalism is maintained. *New York v. United States,* 505 U.S. 144, 181, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Alabama contends that the DPPA violates the Tenth Amendment on two grounds. First, Alabama asserts that Congress exceeded its powers by passing the DPPA pursuant to the Commerce Clause. Second, the State argues that the DPPA imposes an unconstitutional obligation upon the State of Alabama to regulate the disclosure of personal DMV records.

In determining whether Congress violated the Tenth Amendment in enacting the DPPA, the court notes well that Congressional Acts are to be afforded great deference and are entitled to a strong presumption of constitutional validity. *See Flemming v. Nestor,* 363 U.S. 603, 617, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). "Judging the constitutionality of an Act of Congress is properly considered 'the gravest and most delicate duty that this Court is called upon to perform.'" *Walters v. National Ass'n of Radiation Survivors,* 473 U.S. 305, 319, 105 S.Ct. 3180, 87 L.Ed.2d 220 (quoting *Rostker v. Goldberg,* 453 U.S. 57, 64, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981)(internal quotations omitted)). Hence, an Act of Congress will be invalidated only "for the most compelling constitutional reasons." *Mistretta v. United States,* 488 U.S. 361, 384, 109 S.Ct. 647, 102 L.Ed.2d 714 (1984).

## A. *Congress's Authority to Pass the DPPA*

Where Congress validly exercises authority delegated to it under the Constitution, Congress does not violate the Tenth Amendment. *Cheffer v. Reno,* 55 F.3d 1517,

1519 (11th Cir.1995)(citing *United States v. Lopez*, 459 F.2d 949, 951 (5th Cir.), *cert. denied*, 409 U.S. 878, 93 S.Ct. 130, 34 L.Ed.2d 131 (1972)).[7] Defendants assert that the DPPA was valid exercise of Congress's authority, under the Commerce Clause, to regulate activities that affect interstate commerce. (Defs.' Mem. in Supp. at 17) (citing *United States v. Lopez*, 514 U.S. 549, 558–59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).) The State, however, contends that Congress exceeded its Constitutional authority in legislating the State's release of public records, as such release is neither commerce nor an activity substantially affecting commerce. (Pls.' Br. in Supp. of Pls.' Resp. to Order to Show Cause and Defs.' Mot. to Dis. at 3.) The State further contends that Congress's attempt to regulate said release through its link to interstate commerce is too attenuated to pass muster under the Supreme Court's holding in *United States v. Lopez*, 514 U.S. 549, 550, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). (Pls.' Br. in Supp. of Mot. for Summ. J. at 7.)

 Article I, Section 8, Clause 3 of the Constitution empowers Congress to "regulate Commerce ... among the several states." U.S. Const. art. I, § 8, cl. 3. Pursuant to this power, Congress may: (1) regulate channels of interstate commerce; (2) regulate instrumentalities of, or persons or things in, interstate commerce; and (3) regulate intrastate activities that substantially affect interstate commerce. *Lopez*, 514 U.S. at 558–59. Thus, a statute need not regulate economic activity directly in order to satisfy the requirements of the Commerce Clause. *USA v. Olin*, 107 F.3d 1506, 1509 (11th Cir.1997)(citing *Lopez*, 514 U.S. at 558–59).

 However, where Congress seeks to regulate activities arising out of or connected to a commercial transaction, such activities, viewed in the aggregate, must be found to "substantially affect[] interstate commerce." *Lopez*, 514 U.S. at 561. The statute "must bear more than a generic relationship several steps removed from interstate commerce, and it must be a relationship that is apparent, not creatively inferred."

7. Decisions of the Former Fifth Circuit filed prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of*

*United States v. Wright*, 117 F.3d 1265, 1270 (11th Cir.1997) (quoting *United States v. Kenney*, 91 F.3d 884, 888 (7th Cir.1996)), *vacated in part on r'hring*, 133 F.3d 1412, 1998 WL 29636 (11th Cir.1998). "Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." *Lopez*, 514 U.S. at 559.

 The Eleventh Circuit has stated that *Lopez* does not require that Congress make formal legislative findings connecting the regulated activity to interstate commerce. *Wright*, 117 F.3d at 1269 (citing *Olin*, 107 F.3d at 1510). Rather, so long as Congress has a "rational basis" for concluding that a regulated activity sufficiently affects interstate commerce, its validity under the Commerce Clause is sound. *Id.* (citing *Lopez*, 514 U.S. at 557). Thus, the DPPA survives Commerce Clause scrutiny if the court finds that Congress had a rational basis to conclude that the conduct regulated by the DPPA "arises out of or is connected with a commercial transaction, which, viewed in the aggregate, substantially affects interstate commerce," so long as that connection is not too attenuated. *Wright*, 117 F.3d at 1270 (quoting *Lopez*, 514 U.S. at 561).

 Defendants contend that Congress's passage of the DPPA was a valid exercise of its Commerce Clause powers, as Congress enacted the DPPA for the purpose of regulating "the buying and selling, or disclosing and receiving, of a commodity, personal information, in a national commercial market that trades in it." (Defs.' Mem. in Supp. at 19.) Defendants urge that Congress had a solid foundation for linking the DPPA to interstate commerce, as "States' release of personal DMV information into the national market for personal information clearly has a substantial effect on interstate commerce." (Defs.' Mem. in Supp. at 35 n. 33.) In support of this contention, Defendants cite testimony contained in the Congressional Record concerning the DPPA. For instance, in considering the DPPA, Congress heard testimony regarding the wide scope of nationwide trade in personal DMV information. (Defs.'

*Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981)(en banc).

Mem. in Supp. at 19) (citing 139 Cong. Rec. S15,764 (statement of Sen. Boxer); *id.* (statement of Sen. Warner); *id.* at S15,765 (statement of Sen. Robb); 140 Cong. Rec. H2,522 (Apr. 20, 1994)(statement of Rep. Moran); *id.* at H2,526 (statement of Rep. Goss)). This trade, in which more than half of the States are engaged, includes the sale of personal DMV records to businesses who use it in direct marketing nationwide. *Id.*

Plaintiffs challenge Defendants' characterization of the disclosure of information contained in the DMV records as "commerce." Specifically, Plaintiffs argue that Alabama does not and never has trafficked in the commercial sale of public motor vehicle records. Rather, the State charges only a "nominal fee to cover administrative expenses related to the release of public writings." (Amend.Compl.¶ 15.) Thus, Plaintiffs argue, the federal government's justification of the law as regulation of commercial activity in which states are "market participants" is "inapposite." (Pls.' Br. in Supp. of Mot. for Summ. J. at 7.) Any link between the State's public disclosure laws and interstate commerce, Plaintiffs argue, is attenuated at best. (Pls.' Resp. to Order to Show Cause and Defs.' Mot. to Dis. at 4.)

The court finds that Congress had a rational basis to conclude that States' disclosure of personal DMV records has a substantial, apparent, effect on interstate commerce sufficient to withstand scrutiny under the Tenth Amendment. *See Wright,* 117 F.3d at 1270. Even viewing the record before the court in a light most favorable to the State, it is nevertheless apparent that Congress, in considering the DPPA, heard testimony revealing that, once released, personal DMV information is often used in direct marketing campaigns or *resold* by database-compiling companies to other companies for use in direct-marketing campaigns. (*See* Statement of Dr. Mary J. Culnan, 1994 WL 14168083, attached

as Ex. 5 to Pls.' Mem. in Supp.) Furthermore, Congress learned that direct marketing is a "national" industry, as list compilers serve customers a "national audience" of customers. (*See id.*) Thus, whether Alabama receives a profit from the disclosure of personal DMV information, or otherwise "traffic[s] in the commercial sale" of personal DMV information is irrelevant. Rather, Congress concluded that the very fact that such information is disclosed substantially impacts the national trade of DMV records. Hence, regulation of *all* States' disclosure of personal DMV records is necessary for the regulation of the interstate trade of such records. Accordingly, the court finds that Congress had an apparent and rational basis for finding that the regulation of States' disclosure of personal DMV records has a substantial effect on interstate trade. As the court need not pile "inference upon inference" in order to reach this conclusion, the Act falls within the scope of Congress's authority pursuant to the Commerce Clause. *See Lopez,* 514 U.S. at 559, 566.[8]

**B.** *The DPPA Does Not Compel the State to Regulate*

 Congress's power under the Commerce Clause to regulate activities substantially affecting interstate commerce authorizes Congress to regulate state activities, as well. *Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 550, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985)(upholding federal statute requiring states to pay their employees according to minimum wage and overtime standards). However, this authority is limited; Congress may not compel states or state officers to regulate. *Printz v. United States,* —— U.S. ——, 117 S.Ct. 2365, 2384, 138 L.Ed.2d 914 (1997); *New York v. United States,* 505 U.S. 144, 175–76, 112

---

**8.** Defendants also note that Congress passed the DPPA pursuant to its powers under Section 5 of the Fourteenth Amendment, based on its finding that state DMVs were violating the constitutional right of privacy of stalking victims by releasing their home addresses and phone numbers through DMV records. (Defs.' Mem. in Supp. at 25 n. 25 (citing 139 Cong. Rec. S15763 (State-

ment of Sen. Boxer)).) Because the court finds that the DPPA is a valid exercise of Congress's power under the Commerce Clause, it need not reach the question of whether the Fourteenth Amendment also provided authorization for the DPPA. *See Cheffer v. Reno,* 55 F.3d 1517, 1519, 1521 n. 7 (11th Cir.1995).

S.Ct. 2408, 120 L.Ed.2d 120 (1992). In its Motion for Summary Judgment, Alabama asserts that the DPPA exceeds Congress's authority to regulate the States, as the statute is an unconstitutional federal directive requiring the State of Alabama to administer a federal program.

In essence, the State argues, rather than regulate the commercial users of the information contained in the DMV records, the DPPA commands the States to regulate the users of the information. (Pls.' Br. in Supp. of Mot. for Summ. J. at 7.) Alabama contends that the DPPA "commandeers the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." *Id.* at 176. In particular, the State argues, because only States title and register motor vehicles and license individuals to drive on public roads, only States can authorize the initial release of the information collected therein. (Pls.' Br. in Supp. of Pls.' Resp. to Order to Show Cause and Defs.' Mot. to Dis. at 6.) Thus, Alabama argues, the DPPA is an attempt by Congress to require that States regulate their own activity, namely the release of DMV records. (*Id.*) In order for States to come into compliance with the regulations issued by the DPPA, they must, in fact, develop and enforce new regulatory schemes to meet the federal goals articulated in the Act. (*Id.*) This violates the Tenth Amendment, Plaintiffs argue, as "Congress insulates itself from accountability to the citizenry by shifting the apparent blame for any problems to the State actors implementing the Act on Congress's behalf." (*Id.*) As basis for this argument, the State relies heavily on *New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), and *Printz v. United States*, —— U.S. ——, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997).

In *New York v. United States*, the Supreme Court addressed the constitutionality of the "take title" provision of the federal Low–Level Radioactive Waste Policy Act, which required States to chose between accepting ownership of waste generated within their borders and regulating according to instructions of Congress. *New York*, 505 U.S. at 152. The Court held that the provision violated the Tenth Amendment, as both "choices" given the States were "unconstitu-

tionally coercive regulatory techniques." *Id.* at 176. The Court found that this provision "commandeers the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program," in violation of the powers given Congress under the Constitution. *Id.* at 176. In sum, the Court held that "[t]he Federal Government may not compel the States to enact or administer a federal regulatory program." *New York*, 505 U.S. at 188.

> [E]ven where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the states to require or prohibit those acts. The allocation of power in the Commerce Clause, for example, authorizes Congress to regulate interstate commerce directly, it does not authorize Congress to regulate state government's regulation of interstate commerce.

*New York*, 505 U.S. at 166.

In *Printz v. United States*, the Court expanded its holding in *New York*. There, the Court held unconstitutional provisions of the Brady Handgun Violence Prevention Act imposing interim requirements on State chief law enforcement officers ("CLEOs") to conduct background checks on prospective handgun purchasers and to perform related tasks. *Printz*, 117 S.Ct. at 2368. Specifically, the Act required that CLEOs:

> make a reasonable effort to ascertain within 5 business days whether receipt or possession [of a firearm by a particular purchaser] would be in violation of the law, including research in whatever state and local recordkeeping systems are available.

*Printz*, 117 S.Ct. at 2369 (quoting 18 U.S.C. § 922(s)(2)). The Court characterized this provision as one directing or forcing state law enforcement officers to participate in the administration of a federally enacted regulatory scheme. *Printz*, 117 S.Ct. at 2369, 2376. The Court held that such a requirement violated the Constitution, because:

> [t]he Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a

federal regulatory program. It matters not whether policymaking is involved, and no case-by-case weighing of burdens or benefits is necessary; such commands are fundamentally incompatible with our constitutional system of dual sovereignty.
*Printz,* 117 S.Ct. at 2384.

A basic principle upon which the Supreme Court rests its holdings in *New York* and *Printz* is the allocation of accountability between States and the federal government. "By forcing state governments to absorb the financial burden of implementing a federal regulatory program, Members of Congress can take credit for 'solving' problems without having to ask their constituents to pay for the solutions with higher federal taxes. And even when the States are not forced to absorb the costs of implementing a federal program, they are still put in the position of taking the blame for its burdensomeness and for its defects." *Printz,* 117 S.Ct. at 2382.

In characterizing the DPPA as "a federal mandate that requires the State of Alabama to design, implement and enforce administrative procedures regulating its release and its citizens' access to and use of motor vehicle records," the State analogizes the DPPA to the act at issue in *Printz.* (Pls.' Br. in Supp. of Mot. for Summ. J. at 10.) "Much like the portion of the 'Brady Bill' which commandeered participation of State law enforcement, the DPPA mandates 'the forced participation of the States' executive in the actual administration of a federal program'" by prohibiting States from releasing privacy related records, except in accordance with a federal plan. (Pls.' Br. in Supp. of Mot. for Summ. J. at 8, 9 (quoting *Printz,* 117 S.Ct. at 2376).)

Defendants contend that Alabama's argument misconstrues both the DPPA and Tenth Amendment jurisprudence, and urge the court to critically evaluate Plaintiffs' representation of the DPPA, and that of the other District Courts which have addressed its constitutionality.[9]. According to Defendants, rather than directing States to regulate, the DPPA directly regulates state activities that substantially affect interstate commerce, as the DPPA neither directs the States or their officials to regulate their citizens, nor to construct any regulatory regime. (Defs.' Mem. in Supp. at 16.)

Defendants analogize the DPPA to other constitutional regulations the federal government imposes directly on the States. (Defs.' Mem. in Supp. at 18–19) (citing *Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985)(allowing federal legislation requiring States to pay their employees according to federal minimum wage and overtime standards); *E.E.O.C. v. Wyoming,* 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983)(allowing federal regulation ordering States not to discriminate against their employees on the basis of age).) Defendants argue that, like these constitutional statutes, "the DPPA simply regulates a realm of national economic activity—here, the buying and selling, or disclosing and receiving, of a commodity, personal information, in a national commercial market that trades in it—whether or not the economic actors happen to be States or citizens." (Defs.' Mem. in Supp. at 19.)

Defendants distinguish the statute at issue here from those found unconstitutional in *New York* and *Printz.* In this statute, unlike those at issue in *New York* and *Printz,* "Congress has set forth a comprehensive scheme directly regulating individuals' disclosure and states' disclosures of personal information. It has not enlisted the States to do either job for it." (Defs.' Mem. in Supp. at 25.) Defendants argue that "the DPPA directs neither states or their officials to regulate individuals' behavior for it, nor compels States to craft new administrative or legislative schemes designed to regulate the state's own activities." (Defs.' Mem. in Supp. at 23.)

Specifically, Defendants argue, the DPPA does not "call upon states or state officials to legislate pursuant to congressional direction," nor does the DPPA "conscript state officers to help the federal government search for potential violations of federal law." (Defs.' Mem. in Supp. at 23.) The DPPA does not require that State officials

---

**9.** Both the district court of South Carolina and the district court of Oklahoma have found that the DPPA, like the provision at issue in *Printz,* violates the Tenth Amendment. *Condon v. Reno,* 972 F.Supp. at 986; *Oklahoma v. United States,* 994 F.Supp. 1358 (W.D.Okl.1997).

report or arrest violators of the Act; nor does it require States to ensure that state citizens not use, sell or otherwise violate the Act. (Defs.' Mem. in Supp. at 24.) Rather, Defendants argue, the DPPA "directly regulates individuals' use of that information." (Defs.' Mem. at 24.) Further, Defendants argue, the DPPA does not impermissibly compel States to pass laws or invent administrative schemes to govern their own activities; Congress itself has articulated a federal regulatory scheme to directly regulate the state activities by setting forth restrictions on disclosure of personal DMV information by States and private individuals. (Defs.' Mem. in Supp. at 24–25.) In sum, Defendants argue, the DPPA requires no regulatory or enforcement action on the part of the State or state officials. (Defs.' Mem. at 25.)

The court agrees with Defendants' characterization of the DPPA and finds that the DPPA is not the type federal legislation prohibited by *New York* and *Printz*. Rather, the court finds that the DPPA is analogous to the statute found constitutional in *South Carolina v. Baker*, 485 U.S. 505, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988). There, the Court upheld the constitutionality of an Internal Revenue Code provision denying federal income tax exemptions for interest earned on state issued unregistered ("bearer") bonds, specifically rejecting South Carolina's argument that the provision violated the Tenth Amendment. *Id.* 485 U.S. at 515. In reaching its holding, the Court analyzed the provision as if it directly regulated the States by prohibiting outright the issuance of bearer bonds. *Id.* at 511. As in the instant case, the State in *South Carolina v. Baker* argued that the prohibition "commandeers the state legislative and administrative process by coercing States into enacting legislation" and administrating a scheme to comply with the federal provision. *Id.* at 513.

The Court held, however, that the provision at issue in *South Carolina v. Baker* regulates state activities—specifically the issuance of non-registered bonds—rather than the manner in which States regulate private parties. *Id.* at 514. The Court rejected the State's argument that the provision, though regulating the state, nevertheless commandeers the State legislative and administrative process because the State's legislature had to

amend numerous statutes to comply with the federal provision, and because state officials would be required to "devote substantial effort to determine how best to implement" the system required by the federal provision. *Id.* at 514. The Court stated:

> Such "commandeering" is, however, an inevitable consequence of regulating a state activity. Any federal regulation demands compliance. That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect.

*South Carolina*, 485 U.S. at 514–15. The Court further stated that "Congress could constitutionally impose federal requirements on States that States could meet only by amending their statutes." *South Carolina*, 485 U.S. at 515. *See also Federal Energy Regulatory Comm'n v. Mississippi*, 456 U.S. 742, 762, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982) (*"FERC"*)("[T]here are instances where the Court has upheld federal statutory structures that in effect directed state decisionmakers to take or to refrain from taking certain actions.").

The court finds that the DPPA, like the statute at issue in *South Carolina v. Baker*, is one which directly regulates the states, rather than requires the states to administer or enforce a federal regulation. This distinguishes the DPPA from the provisions at issue in *New York* and *Printz*—both of which the Court found required States to regulate certain activity according to the instructions of Congress. *New York*, 505 U.S. at 175; *Printz*, 117 S.Ct. at 2383. As Defendants note, the DPPA neither asks State officials to arrest or report violators of the DPPA, nor does it require States to ensure that state citizens do not use, sell or otherwise redisclose personal DMV information. Unlike the provision at issue in *Printz*, the DPPA requires no affirmative action by the State or its officers. *See Printz*, 117 S.Ct. at 2369.

Rather, the DPPA merely prohibits States from disclosing personal DMV records for any impermissible purpose; the DPPA itself directly regulates individuals' use of such information by governing how authorized in-

dividuals may resell or re-disclose personal DMV information, making it unlawful for persons to knowingly obtain or disclose personal DMV information for an improper use, and making it unlawful for persons to make false representations to obtain personal DMV records. 18 U.S.C. §§ 2721(c); 2722(a) and (b). The Act provides for fines against individuals who knowingly violate the Act, 18 U.S.C. § 2723(a), as well as authorizes civil actions against individuals who knowingly obtain, disclose or use personal information from a motor vehicle record for an improper use. 18 U.S.C. § 2724. As Defendants state, nothing in the DPPA requires that States or State officials legislate solutions to solve the federally-identified problem of improper disclosure of personal records contained in DMV records. Rather, the DPPA sets forth a bar on the dissemination of information except as provided in the DPPA by both the State and private individuals. Thus, as in *South Carolina v. Baker*, Congress has simply enacted a prohibition on certain State activity.

Alabama may, indeed, incur some administrative and personnel costs associated with compliance with the Act. (*See* Hagan Aff.) However, the DPPA does not mandate that Alabama enact any specific legislation or regulation; nor does the Act require that the State take any specific action in furtherance of a federal goal.[10] The fact that the State may have to "take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect." *South Carolina*, 485 U.S. at 514–15.[11]

This court is keenly aware of the Supreme Court's trend, indicated by *New York* and *Printz*, of invalidating federal legislation on grounds that it "commandeers" state legislative and administrative processes. Yet, de-

spite these recent holdings prohibiting Congress from compelling the States to enact or administer federal regulatory programs, *South Carolina v. Baker* is still good law. The Court has yet to hold that, where a federal regulation merely demands State compliance, necessitating the State take administrative or even legislative action to achieve such compliance, such regulation amounts to impermissible "commandeering" of the State's legislative or administrative process. Because the court finds that the DPPA falls within the scope of *South Carolina v. Baker*, rather than *New York* and *Printz*, the court must also find that the DPPA presents no constitutional defect.

■■■ Judicial self-restraint mandates the duty of the court to follow controlling precedent, like it or not. While the law may well be changed by the Eleventh Circuit or the Supreme Court, trial courts do not make law—indeed do not even dictate "holdings"—but instead find facts and apply the existing law. Accordingly, it is not within the province of this district court to expand the Court's holdings in *New York* or *Printz* to encompass the present instance. Rather, the court is obligated to follow precedent. The Supreme Court has recently reaffirmed the principle that "if a precedent of [The Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [district court] should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions." *Agostini v. Felton*, —— U.S. ——, 117 S.Ct. 1997, 2017, 138 L.Ed.2d 391 (1997)(quoting *Rodriguez de Quijas v. Shearson/American Express*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)).

Hence, the court finds it is bound by the Supreme Court's holding *South Carolina v.*

---

**10.** The court notes that the DPPA allows States to establish waiver procedures to handle requests for disclosures that do not fall within one of the Act's exceptions, 18 U.S.C. § 2721(d), as well as allows States to release personal information for certain purposes, so long as they establish a way for individuals to prohibit such disclosure. 18 U.S.C. § 2721(b)(11),(12). However, these provisions are permissive, rather than mandatory. Thus, despite the fact that States may establish waiver and "opt out" provisions in order to

disclose information for otherwise impermissible purposes, they are not required to do so.

**11.** In so finding, the court respectfully disagrees with both the South Carolina and Oklahoma district courts' findings that the DPPA requires States to regulate their citizens' access to and use of personal DMV records. *Condon*, 972 F.Supp. at 986 (finding that the DPPA violates the Tenth Amendment); *Oklahoma v. United States*, 994 F.Supp. 1358 (W.D.Okl.1997)(same).

*Baker.* The DPPA does not violate the Tenth Amendment, as it is a direct prohibition on the State from releasing personal DMV records for impermissible purposes, rather than a regulation requiring the State to enforce the federal government's ban on personal DMV disclosures. While the court is keenly aware of the way in which "forcing state governments to absorb the financial burden of implementing a federal regulatory program" threatens the balance of our system of federalism, *Printz,* 117 S.Ct. at 2382, any costs incurred by the State, or actions that the State must take as it attempts to come into compliance with the DPPA, do not amount to the "commandeering" found impermissible in *New York* and *Printz.* *See South Carolina,* 485 U.S. at 514–15.[12] Based on the foregoing, the court finds that the DPPA does not violate the Tenth Amendment.

### III. *Eleventh Amendment*

Alabama would also urge the court to find that the DPPA violates the Eleventh Amendment to the United States Constitution. The Eleventh Amendment states:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.

Plaintiffs argue that two provisions within the DPPA violate the Eleventh Amendment. First, § 2723(b) of the Act provides for a $5,000 a day civil penalty against the state for noncompliance. It states:

> Any State department of motor vehicles that has a policy or practice of substantial noncompliance with this chapter shall be subject to a civil penalty imposed by the Attorney General of not more than $5,000

a day for each day of substantial noncompliance.

18 U.S.C. § 2723(b).

In addition, the Act provides for a civil damages remedy against a person who knowingly discloses personal information from a motor vehicle record. 18 U.S.C. § 2724(a) provides:

> A person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter, shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court.

18 U.S.C. § 2724(a).

The Act further provides that, pursuant to this civil action remedy, the court may award actual damages of not less than liquidated damages in the amount of $2,500, punitive damages upon proof of willful or reckless disregard of the law, reasonable attorneys fees and costs, as well as other equitable relief. 18 U.S.C. § 2724(b).

Plaintiffs argue that these provisions violate the Eleventh Amendment because they allow for suits against state employees and agents. Plaintiffs cite *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), for the proposition that the Commerce Clause does not grant Congress the power to abrogate the States' sovereign immunity. Thus, absent a waiver by the State, Congress may not authorize suit against the state.

"[T]he Eleventh Amendment bars suits in federal court 'by private parties seeking to impose a liability which must be paid from public funds in the state treasury.'" *Hafer v. Melo,* 502 U.S. 21, 30, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991)(quoting *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). However, "the Eleventh Amendment does not erect a barrier against suits to impose 'individual

---

**12.** The court notes well that the Tenth Amendment serves to prohibit Congress from easily "tak[ing] credit for 'solving' problems without ... ask[ing] their constituents to pay for the solutions with higher federal taxes," thereby "forcing state governments to absorb the financial burden of implementing a federal regulatory

program." *Printz,* 117 S.Ct. at 2382. Had the court found that the DPPA presented such a situation, the court would not have hesitated to find the Act constitutionally infirm. However, as discussed *infra,* the court finds that the DPPA does not pass along to the States the cost of implementing a federal regulatory program.

and personal liability' on state officials." *Hafer*, 502 U.S. at 30–31. Thus, where a statute authorizes suit against state employees personally, the Eleventh Amendment erects no bar. *See Hafer*, 502 U.S. at 31; *Cross v. State of Alabama*, 49 F.3d 1490, 1503 (11th Cir.1995).

▮▮▮▮▮ The court finds that the DPPA does not authorize suits by private individuals against the State. The definitional section of the DPPA clearly indicates that any suits authorized by the DPPA against "any person" knowingly disclosing personal information from a motor vehicle record in violation of the DPPA excludes suits against the State or State agencies. Specifically, 18 U.S.C. § 2725(2) states:

> "person" means an individual, organization or entity, but does not include a State or agency thereof.

18 U.S.C. § 2725(2). Hence, by its own terms, the Act authorizes private suits against individuals, yet precludes such suits against the state.[13]

Plaintiffs would have the court find that § 2725(1)'s definition of "person" is irrelevant for purposes of Eleventh Amendment analysis. Plaintiffs state that, because "the primary 'disclosures' of information defined by the DPPA are state DMV employees, 18 U.S.C. § 2724(a) clearly exposes state employees to suit and thus effectively authorizes damage suits against the states." (Pls.' Br. in Supp. of Pls.' Mot. for Summ. J. at 10–11.) Alabama argues that to interpret "persons" not to include State actors but to expose State workers to personal financial liability for following the instructions of their superiors would render the statute meaningless. (Pls.' Resp. to Order to Show Cause and Defs.' Mot. to Dis. at 7.) Alabama states that, because only State employees have access and ability to make an initial release of personal DMV information, suits against State employees for following State law and procedure (presumably in accordance with Alabama's Open Records Act) as relates to the DPPA "must necessarily be a claim against the State and therefore subject to Eleventh amendment immunity." (Pls.' Resp. to Order to Show Cause and Defs.' Mot. to Dismiss at 7.) Plaintiffs further argue that, should the court accept Defendants' interpretation of the statute, personal immunity defenses allowed for state employees would render the statute meaningless as well. (*Id.* at 8.)

Although the State would have the court find that such a reading of the statute renders it "meaningless," such a reading is the statute's "plain meaning." Thus, the court construes the State's argument as an invitation for the court to interpret the statute as authorizing suit against state employees in their official capacity, despite the statute's express words to the contrary. The court respectfully declines the State's invitation to interpret the DPPA contrary to its clear meaning. Rather, the court is mindful of its duty to respect the enactments of a legislative body.

▮▮▮▮▮ It is a maxim of statutory construction that a court must give plain meaning to a statute where such meaning is patent. "[W]here the words of a law, treaty, or contract, have a plain and obvious meaning, all construction, in hostility with such meaning, is excluded. This is a maxim of law, and a dictate of common sense." *Green v. Biddle*, 21 U.S. (8 Wheat.) 1, 89–90, 5 L.Ed. 547 (1823). Furthermore, "[f]ederal statutes are to be so construed as to avoid serious doubt of their constitutionality. 'When the validity of an act of Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.' *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 [(1932)]." *Concrete Pipe & Products of Cal. v. Construction Laborers Pension Trust for So. Cal.*, 508 U.S. 602, 628, 113

---

13. By authorizing private suits for civil damages against "persons," but defining "person" to exclude the State or any State agency, the DPPA precludes such suits against individuals in their "official capacity." It is well-settled that a suit for monetary relief against a state officer in his or her official capacity is deemed a suit against the state. *See e.g. Cross v. State of Alabama*, 49 F.3d 1490, 1503 (11th Cir.1995)(citing *Lassiter v. Alabama A & M University*, 3 F.3d 1482, 1485 (11th Cir.1993)). Further, the statute in no way precludes individuals from asserting the defense of "qualified immunity." *See Gold v. City of Miami*, 121 F.3d 1442 (11th Cir.1997).

S.Ct. 2264, 124 L.Ed.2d 539 (1993)(quoting *Machinists v. Street,* 367 U.S. 740, 749–750, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961)).

 The State further argues that Congress is precluded by the Eleventh Amendment from authorizing suit against the State by the United States. Accordingly, the State argues, § 2723(b), authorizing the Attorney General to impose a civil penalty against the State, is unconstitutional. The court finds that this argument is patently frivolous. The Supreme Court has refused to apply the Eleventh Amendment to bar federal court suits by the United States government against a state. Rather, the Court has explicitly stated, "the Federal Government can bring suit in federal court against a State." *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 1131 n. 14, 134 L.Ed.2d 252 (1996). *See also United States v. Mississippi,* 380 U.S. 128, 140–41, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965); *United States v. Texas,* 143 U.S. 621, 641–47, 12 S.Ct. 488, 36 L.Ed. 285 (1892). Contrary to the State's contention, it is irrelevant which Constitutional provision authorizes the statute in question. Again, the court respectfully declines to override over one hundred years of Supreme Court precedent to find that the Eleventh Amendment precludes Congress from authorizing the United States to bring a suit against a State. The court takes very seriously its oath and obligation to uphold the supreme law of the land and would neither be presumptuous enough nor "activist" enough to deem that it, as a district court, has the authority to make new law. Accordingly, the court finds that the DPPA does not violate the Eleventh Amendment to the United States Constitution.

### ORDER

Based on the foregoing, the following is hereby CONSIDERED and ORDERED:

(1) Plaintiffs' Motion for Summary Judgment be and the same is hereby DENIED;

(2) Defendants' Motion to Dismiss, construed by the court as a Motion for Summary Judgment, be and the same is hereby GRANTED;

(3) Plaintiffs' Motion for a Preliminary Injunction be and the same is hereby DENIED as moot; and

(4) All costs herein incurred be and the same are hereby taxed against Plaintiff, for which let execution issue.