751 So.2d 1238 (1999)
TFT, INC.
v.
WARNING SYSTEMS, INC., et al.
Warning Systems, Inc.
v.
TFT, Inc.
1980664 and 1980705.
Supreme Court of Alabama.
November 24, 1999.
*1239 Madeline H. Haikala, Jackson R. Sharman III, and Lisa J. Wathey of Lightfoot, Franklin & White, L.L.C., Birmingham, for appellant/cross appellee.
J. Fairley McDonald III of Maynard, Cooper & Gale, P.C., Montgomery, for appellee/cross appellant Warning Systems, Inc.
Dennis M. Wright, asst. atty. gen., for appellee/cross appellant Alabama Emergency Management Agency.
A. Lee Miller, general counsel, for appellee/cross appellant Alabama Finance Department.
HOOPER, Chief Justice.
This case arises out of a competitive bid on a Tone Alert Radio ("TAR") System intended for use in connection with the destruction of chemical weapons. TFT, Inc., filed a complaint seeking declaratory and injunctive relief. It alleged that the Purchasing Division of the State Finance Department had awarded the contract for the TAR system to Warning Systems, Inc. ("WSI"), in violation of §§ 41-16-20 through -32, Ala.Code 1975. Those Code sections require the State to award certain contracts to the lowest responsible bidder. The trial court denied injunctive relief as to that portion of the contract relating to the TAR receivers; however, it enjoined the execution of the contract as it related to the central-control equipment and the operating-support system, concluding that *1240 a bid for this equipment must be resolicited. TFT appealed from the order denying an injunction in regard to the TAR receivers, and WSI cross-appealed from the injunction relating to the central-control equipment and the operating-support system. We affirm in part and reverse in part.

Facts
The Alabama Emergency Management Agency ("AEMA"), acting through the State Finance Department's Purchasing Division, solicited bids on Project 98-R-2071, which involved TAR receivers to be used in connection with the destruction of chemical weapons or chemical agents stockpiled at a United States Army facility in Anniston. As part of its obligations under the Chemical Stockpile Emergency Preparedness Program, the State was required to purchase and install a system to alert persons at nearby homes, businesses, and other facilities in the event of an emergency. TFT, WSI, and another company, Federal Signal, submitted bids. AEMA and the Purchasing Division awarded the contract to WSI. TFT claims that those agencies, in awarding the contract to WSI, violated the State's obligation under Ala. Code 1975, § 41-16-20, to award the contract to the "lowest responsible bidder."
The dispute concerns whether the State's Invitation to Bid ("ITB") was a solicitation for bids as to only one component of the system or was a solicitation for bids as to the entire system. The ITB described the TAR System as involving three major items: The central-control equipment, the indoor-warning device (TAR receiver), and the operating-support system. The ITB also stated that the seller would be required to deliver 12,000 indoor alerting devices and 2 control-point-equipment sets by September 1, 1998.
WSI submitted questions regarding the pricing format for the bid responses. In an Addendum to the ITB, which was provided to all of the interested bidders, AEMA responded:
"P2A. The initial procurement will be for approximately 12,000 Ea., 800 MHz. TAR receivers only. The bidder should provide a quotation for the support services, the VHF TAR receiver, and the accessory devices as outlined in the Technical Specifications. The bidder's price for these additional items will be considered in the selection of the successful bidder for the 12,000 UHF TAR receivers. The bidders should provide pricing information for the support activities for a period of five years from date of award. A base price with annual increases would be acceptable to the State.
"P2B. The State is purchasing the TAR equipment and the long term support activities for the public warning obligations of the CSEPP program. There are several aspects of the overall program that have not been defined because of the lack of demographic information on the affected portions of the population. The support functions to be provided and the accessory equipment are described in the Technical Specifications in sufficient detail to permit the bidder to provide a quotation for these items. The State would ask that the bidder present the pricing information in the form of a price matrix that would allow the State to determine the pricing for these activities and equipment on an item-by-item basis. After the State determines the extent of the support requirements and the number of accessory devices needed, a subsequent purchase order will be issued based on the prices offered with this bid response."
(Emphasis added.) In reliance on these answers, WSI understood the ITB as requesting a bid on the receivers only, with an additional price matrix regarding the central-control equipment and the operating-support system, as well as the optional accessory devices. WSI submitted a bid of $175 per receiver unit and included a price matrix regarding the other components.
*1241 One of the other bidding vendors, Federal Signal, also submitted a question regarding the pricing format:
"The Price Sheet for this Bid does not include separate line items for 800 MHZ and VHF receivers, or for the two (2) control point equipment sets required for this bid. Should pricing for one of the receiver models and the Control point equipment be submitted on a separate quote sheet with the options for installation, external antennas, and service support operations or will an addendum be issued for the Price Sheet?"
AEMA responded:
"The state has already replied to an earlier question on this subject. A price submittal in the form of a `matrix' would be reasonable. This `price matrix' should permit the state to determine the pricing on an item-by-item basis. An addendum is not needed.
(Emphasis added.) Federal Signal included the total-system price within its unit price of $215.0833. (R.T. 58-59.) However, Federal Signal also included a price matrix listing the price of each component separately.
TFT understood the ITB to be requesting bids on the entire TAR system, including all three components, and calculated its bid by including the entire-system cost within the unit price. TFT calculated its bid as follows: 12,000 receivers at a price of $165 each, for a total of $1,980,000; plus $13,118 for the control equipment, $141,750 for installation, and $505,252 as the cost of the first year's support, for a total system price of $2,640,000. TFT then divided the total by 12,000 to get an installed receiver unit price of $220.[1] TFT did not include a price matrix regarding the receivers, central-control equipment, or operating-support system, but did list the separate prices of the optional equipment and the support services for years two through five. The trial court found that, because TFT combined the prices of the TAR receivers, the central-control equipment, and the operating-support system, its bid was nonresponsive.
The Price Sheet provided in the ITB contained a line item price blank with a description of "radio receiver, tone alert (TAR) in accordance with provided specifications." According to the vendors' bids on the price sheet, WSI bid $165 per unit; TFT bid $220 per unit; and Federal Signal bid $215.0833 per unit. The State awarded the contract to WSI as the lowest responsible bidder. Both TFT and Federal Signal protested the award of the contract to WSI. TFT claimed in its protest that an examination of the bid responses makes it clear that WSI is in fact the high bidder. TFT stated that if the State considered the price of the central-control equipment and the first-year operating support in making its award, then WSI was the highest bidder. In its protest, TFT did not illustrate the manner in which its bid was calculated and did not list item-by-item prices. The Legal Division of the Finance Department responded to TFT's protest, stating that AEMA had reviewed the bids and had confirmed that WSI was the lowest responsible bidder complying with the instructions of the ITB and whose products met all mandatory technical specifications.

Discussion

I. Standard of Review
The applicable standard of review depends on whether the trial court entered a preliminary injunction or a permanent injunction. A preliminary injunction is reviewed under an abuse-ofdiscretion standard, whereas a permanent injunction is reviewed de novo. Smith v. Madison County Comm'n, 658 So.2d 422, 423 n. 1 (Ala.1995). The trial court used the term "preliminary injunction" throughout its order. The language of the order denies a "preliminary injunction" as to the TAR receivers, but grants a "preliminary injunction" as to the central-control equipment and the operating-support *1242 system; the injunction requires that the bids on those components be resolicited. However, TFT argues that the court and the parties had agreed during the hearing that the requests for both preliminary and final relief could be combined. (Appellee's brief, at 1.) (R.T. 54-55.) Combining those requests is provided for in Rule 65(a)(2), Ala. R. Civ. P., although normally, when the court orders that the hearing on the merits be consolidated with a hearing on the request for a preliminary injunction, the parties are given notice of that before the hearing, in order to afford them the opportunity to fully present their respective cases. University of Texas v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). In this case, the trial court asked the parties during the hearing, "Are we going to combine this hearing with any subsequent hearing, for the record?" and to that question counsel for each of the parties responded, "Yes, sir." (R.T. 54-55.)
WSI admits in its reply brief that its counsel intended to consolidate the hearing on the request for a preliminary injunction with the trial on the merits, and WSI even agrees that judicial economy suggests such a consolidation. Yet, WSI argues that, because the trial court never ordered such a consolidation and because the trial court's order clearly refers to a "preliminary injunction," that order must be treated as a preliminary injunction. However, in Union Springs Telephone Co. v. Green, 285 Ala. 114, 229 So.2d 503 (1969), this Court held that when the parties and the court have treated a hearing as one on the merits, rather than as one on a motion to dissolve an injunction, this Court will also treat it as a hearing on the merits.
WSI also argues that because no injunction bond was posted, it was error to enter a preliminary injunction as to the central-control equipment and the operating-support system, and that the order entering the injunction therefore must be reversed. In contrast, TFT argues that the trial court's failure to require an injunction bond indicates that the trial court intended the injunctive order to serve as a permanent injunction, for which no bond is necessary.
To be entitled to a permanent injunction, a plaintiff must demonstrate success on the merits, a substantial threat of irreparable injury if the injunction is not granted, that the threatened injury to the plaintiff outweighs the harm the injunction may cause the defendant, and that granting the injunction will not disserve the public interest. Clark Constr. Co. v. Pena, 930 F.Supp. 1470 (M.D.Ala. 1996). The elements required for a preliminary injunction and the elements required for a permanent injunction are substantially similar, except that the movant must prevail on the merits in order to obtain a permanent injunction, while the movant need only show a likelihood of success on the merits in order to obtain a preliminary injunction. Pryor v. Reno, 998 F.Supp. 1317 (M.D.Ala.1998). The purpose of a preliminary injunction is to preserve the status quo until a full trial on the merits can finally determine the contest. Camenisch, 451 U.S. at 395, 101 S.Ct. 1830.
In this case, the court held a two-day hearing, and both parties presented testimony and other evidence as to the merits of the case. The relief granted by the trial court does more than preserve the status quo, because it actually examines the merits of the case and requires the State to resolicit bids for part of the contract. Despite its use of the words "preliminary injunction," the trial court's injunctive order has the effect of a permanent injunction, and it should be treated as such. Therefore, the proper standard of review is the de novo standard as opposed to the abuse-of-discretion standard. Madison County Comm'n, 658 So.2d at 423, n. 1.

II. Denial of Injunction as to the TAR Receivers
TFT argues that the court should have granted injunctive relief because, it *1243 argues, the contract between the State and WSI is void under Alabama's Competitive Bid Law. Specifically, TFT argues that its bid for the TAR receivers was actually lower than WSI's bid, but that TFT calculated its bid by a method different from the method WSI used, because TFT interpreted the ITB differently. This case turns on whether the ITB was a solicitation for bids as to the entire TAR system, as TFT argues, or was a solicitation for a unit-price bid as to the TAR receivers and for price quotations on the other components, as WSI claims.
Before this Court, for the first time, TFT attempts to argue that the ITB was ambiguous and that the project, therefore, should be rebid. Because TFT did not raise this argument in the trial court, it cannot raise it now on appeal. Abbott v. Hurst, 643 So.2d 589, 593 (Ala.1994). The only mention of ambiguity TFT made at trial came in one sentence of TFT's trial brief, wherein TFT asserted that the AEMA and the Purchasing Division had acted arbitrarily and capriciously in allowing an inexperienced person to handle the bid process. TFT states, "Not surprisingly, the ITB and the addendum he issued were ambiguous at best." (R. 350.) In Knight v. Alabama Power Co., 580 So.2d 576 (Ala.1991), this Court refused to consider an argument that was not sufficiently raised before the trial court. In Knight, the appellant had included in an amended response to a motion for summary judgment one sentence asking the trial court to adopt the doctrine of comparative negligence. The appellant in Knight had, in the trial court, presented nothing in the way of argument on the issue. Similarly, at the trial in this present case, TFT did not argue that the ITB was ambiguous, either in its pleadings or during the hearing. In contrast, TFT consistently maintained before the trial court that the ITB was a solicitation for bids as to the entire TAR system and that TFT understood what the ITB was soliciting. This Court's review is restricted to the evidence and arguments considered by the trial court. Andrews v. Merritt Oil Co., 612 So.2d 409 (Ala.1992).
TFT claims that had the State investigated the basis of the bids, it would have realized that TFT's bid was the lowest. Alabama's Competitive Bid Law, specifically Ala.Code 1975, § 41-16-50, does not require that the award of a public contract go to the lowest bidder, but to the "lowest responsible bidder." See Advance Tank & Constr. Co. v. Arab Water Works, 910 F.2d 761 (11th Cir.1990); White v. McDonald Ford Tractor Co., 287 Ala. 77, 248 So.2d 121 (1971). This Court has stated that an agency's determination of whether the apparent low bidder on a contract is "responsible" should not be disturbed unless the determination was made arbitrarily or capriciously. Advance Tank, 910 F.2d at 765; Mobile Dodge, Inc. v. Mobile County, 442 So.2d 56, 58 (Ala. 1983); McDonald, 287 Ala. at 86, 248 So.2d at 127. The standard for reviewing a determination that a bidder is "responsible" is whether the State's actions constitute fraud or an abuse of discretion. Carson Cadillac Corp. v. City of Birmingham, 232 Ala. 312, 167 So. 794 (1936); Advance Tank, 910 F.2d at 765. This Court has also stated that the courts should not interfere with the discretion of public contracting authorities in determining who was the lowest responsible bidder unless the decision was "based upon a misconception of the law," was the "result of improper influence," was made in "violation of law," or was based "upon ignorance through lack of inquiry." McDonald, 287 Ala. at 86, 248 So.2d at 129 (cited in Advance Tank, 910 F.2d at 765).
The Purchasing Division awarded the contract to WSI, based on its bid in the line-item price blank on the price sheet provided in the ITB. The face of the price sheet indicated WSI was the lowest bidder. When TFT contested the award of the contract to WSI, claiming to be the true lowest bidder, the AEMA and the Purchasing Division reviewed all of the bid *1244 responses and concluded that TFT had not provided pricing for the central-control equipment and had not complied with the instructions regarding the itemized pricing of support items. (Plaintiff's exhibit 34.) TFT argues that this conclusion was incorrect because, TFT says, it did include pricing for the central-control equipment within its bid for the receivers. TFT also maintains that even if it did not provide a separate price for the equipment, that fact should not be dispositive because the ITB did not specifically ask for the pricing of the equipment.
"`[H]onest exercise of discretion... will not be interfered with by the courts, even if erroneous.'" Advance Tank, 910 F.2d at 765, n. 12, quoting 64 Am.Jur.2d Public Works and Contracts § 67 (1972). After reviewing the Price Sheets submitted by the three bidding vendors, this Court cannot ascertain TFT's price for the central-control equipment. Because TFT's price for the equipment is imbedded within the unit price for the receivers, the AEMA and the Purchasing Division did not act arbitrarily and capriciously in concluding that TFT did not submit a price for the equipment. The agencies properly reviewed the bid responses, pursuant to TFT's bid contest, and could not ascertain a price for the equipment. Therefore, the agencies properly inquired as to who was the lowest responsible bidder.
TFT argues that the failure of the agencies to review the way in which TFT's bid was calculated constituted "ignorance through lack of inquiry," making the award to WSI arbitrary and capricious. Specifically, TFT argues that, throughout its proposal, it indicated that its bid was for a system, including central-control equipment, indoor alerting devices, and support activities. TFT also included the following statement in its summary:
"This bid is in response to the State of Alabama's request for
"12,000 UHF Indoor Alerting Devices, including installation and one year's support, and 2 sets of Central Control Equipment."
TFT contends that this statement and other similar statements throughout its proposal provided notice to the agencies that its bid included the cost of central-control equipment and support activities, as well as the cost of the receivers. TFT further contends that through proper inquiry the agencies would have been able to determine the separate prices for these items.
This Court has never set forth rigid standards delineating what constitutes an adequate or proper inquiry in the context of the Competitive Bid Laws. The determination of whether a proper inquiry has been conducted will depend on the situation presented. TFT erroneously asserts that this Court discussed what a proper inquiry consists of in International Telecommunications Systems v. State, 359 So.2d 364 (Ala.1978). In that case, this Court upheld the award of a contract for replacement radio crystals to General Electric Corporation ("GE") because GE's crystals were superior in quality. Even though International Telecommunications Systems ("ITS") submitted the lowest bid, ITS was not the lowest responsible bidder, because its brand of crystals was unsatisfactory. The ITB had specified "GE parts or equal," and when the bids were opened the ITS representative agreed to supply samples of its crystals for testing, to determine if the crystals were of a quality equal to that of GE crystals. The engineer evaluating the bids then wrote to ITS, stating that the State had not received the samples or a warranty. TFT points to that case as an illustration of "proper inquiry," suggesting that in this present case the State should have contacted TFT for further information about its bid. However, the issue in International Telecommunications Systems was not whether the State had conducted a proper inquiry, but whether the State had acted arbitrarily and capriciously in testing the crystals by *1245 a method different from the method a professional testing laboratory might have used. This Court never stated that to make an adequate inquiry the State must contact a bidder for further information.
In this present case, the State agencies properly reviewed the bids in response to TFT and Federal Signal's contest and concluded that TFT's bid did not comply with the ITB's pricing format. Nowhere in TFT's bid or in its bid protest does TFT explain how its unit price was calculated. Even if the agencies were on notice that TFT's bid included the price of other components within the unit price of the receivers, because TFT did not provide a price matrix listing the item-by-item price of each component the State could not ascertain the price of the individual components. WSI specifically listed the pricing for individual aspects of the central-control equipment and the operating-support system, giving the State the option to purchase some or none of those components. In its price matrix on central-control equipment, WSI provided separate prices for Site 1 and Site 2 primary and backup control equipment. For operating support, WSI provided separate prices for logistic support and other project charges, as well as prices for three different levels of installation, separate prices for different shifts depending on the time and day of the week, and separate prices for on-site replacement based on the number of months after installation. In contrast to WSI's detailed price matrix, TFT's prices were wrapped up into one unit price, with no delineation as to how much of the cost was for the central-control equipment and how much was for the operating-support system, much less any indication of separate prices for the individual aspects making up these components.
The State might have been able to compare the prices for these components had TFT separately listed its prices. However, TFT failed to comply with the pricing instructions of the ITB and its Addendum, which requested an item-by-item listing of the price of each component. Contrary to TFT's suggestion, the State should not be required to contact TFT to request clarification of a bid that was not responsive to the State's request. Therefore, we cannot say the award of the contract to WSI was an abuse of discretion based on ignorance occurring through lack of inquiry.
Further, TFT's bid did not comply with the ITB's technical specifications. The ITB specifically required a "rechargeable lead-acid or gel storage battery." TFT's bid contained a compliance table that expressed an exception, offering a NiCad battery instead. Conformity with the specifications of the ITB is one standard for determining who is the lowest "responsible" bidder. See Advance Tank, 910 F.2d at 765. From the record, it appears that the agencies initially awarded the contract to WSI solely because WSI submitted the lowest bid on the price sheet. However, pursuant to the bid contest, the agencies examined the bids and found TFT's bid to be nonresponsive, based on its failure to comply with technical and pricing specifications. TFT's bid did not properly provide a price for the receivers on the price sheet, did not provide a price matrix as requested in the Addendum to the ITB, and did not meet the technical specifications with regard to the type of battery. We cannot say that the AEMA and the Purchasing Division acted arbitrarily and capriciously in determining that WSI was the lowest responsible bidder. "The single most important requirement of the Competitive Bid Law is the good faith of the officials charged in executing the requirements of the law." McDonald, 287 Ala. at 86, 248 So.2d at 129. Therefore, we affirm the order denying an injunction as to the TAR receivers.

III. Grant of Injunction as to the Other Components
The trial court also determined that the ITB did not include a solicitation of bids for the central-control equipment and the operating-support system; it ordered *1246 that these items be rebid. The court erred. Even TFT argues that the ITB was clearly designed to elicit a bid for the entire TAR system and not just for the receivers. The ITB specifically listed the three major components of the system, and all three bidders made an effort to price the receivers, the central-control equipment, and the operating-support system. The Addendum to the ITB also stated that the vendor's price on the additional items "would be considered in the selection of the successful bidder for the 12,000 UHF TAR receivers."
The evidence in the record shows that the Purchasing Division intended initially to solicit bids only for the receivers and a price matrix for the other components. The Purchasing Division then decided to purchase these components from the same vendor that supplied the receivers. TFT argues that awarding the entire system to a bidder based on the price bid for only the receiver violates Alabama's Competitive Bid Law. The trial court never ruled as to whether the State's approach violated Alabama's Competitive Bid Law. Instead, the trial court simply found that the ITB did not solicit bids for any components of the system other than the receivers.
When the State issued the ITB, the AEMA did not know how many receivers would be required, nor how much funding it would receive from the Federal Emergency Management Agency ("FEMA"); therefore, it decided to buy initially 12,000 receiver units. (R. 164, 171.) The unit price of the receivers was an important element in AEMA's determination because the agency intended to purchase increasingly more receivers as funding became available. (R. 120, 126-27, 149-50.) The receivers would be the most numerous of the items to be purchased. (R. 126-27.) The State had only limited funding from FEMA and intended to purchase the additional componentsthe central-control equipment and the operating-support systemas funds became available; therefore, the State also sought price quotations for the additional components that would eventually be needed to make a complete system. (R. 171-73.) The use of a single vendor to supply all of the components of the system ensures that the components will be compatible, and the solicitation of prices for these other components locks in a price for their future purchase.
No evidence in the record supports the trial court's finding that the ITB did not include the central-control equipment and the operating-support system. In its Addendum to the ITB, the agencies specifically requested that prices for these components be listed in a price matrix, in response to written questions from WSI and Federal Signal. These prices were supposed to be considered in determining the successful bidder. However, because TFT did not submit separate prices for the central-control equipment and the operating-support system, the State could not compare its prices with those of WSI.
We do not find that the State's method of soliciting bids on this contract violates the Competitive Bid Law. Alabama Admin. Code § 355-4-1-.03(8)(a) permits the State to "determine the lowest responsible bidder on the basis of an individual item, group of items or in any way determined to be in the best interest of the state." The Legislature specifically authorized the Finance Department to promulgate regulations with respect to the performance of its duties, and those regulations have the effect of law. Ala.Code 1975, § 41-4-35. The agencies found it to be in the best interest of the State to solicit bids for the TAR receivers, based on the funding available at the time, and to solicit, at the same time, prices for the additional components, in order to guarantee a price for those components to be purchased when funding became available. While we do not find the State's actions in this particular case to constitute fraud or an abuse of discretion, we do not hold that awarding a contract on the basis of one item alone will never violate the Competitive Bid Law.

*1247 Conclusion

The Competitive Bid Law was enacted for the benefit of the public, not for the benefit of the unsuccessful bidder. Advance Tank, 910 F.2d at 765; Townsend v. McCall, 262 Ala. 554, 558, 80 So.2d 262, 265 (1955). TFT contends that it was actually the lowest responsible bidder. We disagree. The ITB and its Addendum solicited bids for the price of the receivers only and solicited a price matrix listing the other components. Further, TFT was not a "responsible" bidder, because its bid did not include the price matrix requested and its receivers did not meet the technical specifications. The AEMA and the Purchasing Division received a responsible bid from WSI indicating the price of the receivers alone and listing the prices of the other components. The agencies did not abuse their discretion in determining that WSI was the lowest responsible bidder. Therefore, we affirm the trial court's order denying an injunction as to the receivers, and we reverse the trial court's injunction as to the central-control equipment and the operating-support system. That injunction is dissolved.
AFFIRMED IN PART; REVERSED IN PART; AND INJUNCTION DISSOLVED.
MADDOX, HOUSTON, SEE, BROWN, JOHNSTONE, and ENGLAND, JJ., concur.
LYONS, J., concurs in the result in part and dissents in part.
LYONS, Justice (concurring in the result in part and dissenting in part).
As to Part II, I concur in the result. As to Parts I and III, I dissent. I would reverse the order entering the injunction because the trial court did not require a bond, and I would remand for further proceedings. Rule 65(c), Ala. R. Civ. P.; Jefferson County Comm'n v. Fraternal Order of Police, Lodge No. 64, 543 So.2d 198 (Ala.1989).
NOTES
[1] We recognize that this mathematical calculation is not precise.