782 So.2d 255 (2000)
SPEEDWAY/SuperAMERICA, L.L.C.
v.
PHILLIPS TRUCK STOP, INC.
1990080.
Supreme Court of Alabama.
October 27, 2000.
Edward S. Sledge III, Russel Myles, and Jason S. McCormick of McDowell, Knight, Roedder & Sledge, L.L.C., Mobile, for appellant.
Thomas M. Galloway, Jr., of Galloway, Smith, Wettermark & Everest, L.L.P., Mobile, for appellee.
MADDOX, Justice.
This appeal requires an interpretation of the Alabama Motor Fuel Marketing *256 Act, §§ 8-22-1 to -18, Ala.Code 1975 ("AMFMA"), and the specific question presented is whether a truck stop located 80 miles away, on an interstate highway, is "a competitor in the same market area" as the defendant's business, so as to permit the defendant to price its fuel "below cost," allegedly to meet competition. The trial court, after having determined that the truck stop located 80 miles away was not a competitor in the same market area, issued a preliminary injunction against the defendant. We reverse and remand.

Facts
Speedway/SuperAmerica, L.L.C. ("Speedway"), built a Travel Center truckstop facility at the I-65/Highway 43 interchange located in Satsuma. This facility has 10 fueling lanes with 20 diesel pumps, and it also has 150 parking slots, truck scales, 8 showers, a Hardee's restaurant, and a laundromat. It opened for business on May 20, 1999.
Phillips Truck Stop, Inc. ("Phillips"), operates a truck-stop facility on Highway 43, about three and a half miles north of the I-65/Highway 43 interchange where the Speedway facility is located. The Phillips facility has six diesel pumps, a convenience store, a restaurant, and some showers.
Phillips filed this action against Speedway, seeking a preliminary injunction to prevent Speedway from pricing its diesel fuel "below cost," as that phrase is used in the AMFMA. At the preliminary-injunction hearing, the parties stipulated, and the trial court agreed, that the hearing would focus on whether Speedway was, in fact, pricing its diesel fuel to "meet competition" of the Flying J truck stop located approximately 80 miles west on I-10 in Gulfport, Mississippi. See § 8-22-8(b), which provides, in part, that "[i]t is not a violation of [the AMFMA] if any price is established in good faith to meet an equally low price of a competitor in the same market area on the same level of distribution selling the same or a similar product of like grade and quality." Even though Speedway agreed that the issue was whether it was meeting the competition of Flying J, it nevertheless expressly reserved the right to challenge the constitutionality of the AMFMA's definition of "cost," inasmuch as the definition of "cost of doing business or overhead expenses" requires fuel retailers to establish a price floor that includes "all costs incurred in the conduct of business." See § 8-22-4(17). Speedway also filed a "Notice of Constitutional Challenge" and served a copy of that notice on the attorney general. The trial court did not specifically address the issue relating to the constitutionality of the AMFMA's definition of "cost of doing business," and neither do we.[1]
The trial court conducted a hearing and, after the hearing, granted a preliminary injunction requiring Speedway to refrain from engaging in price competition with the Gulfport Flying J. The court stated that "whether [the phrase] `a competitor in the same market area' [AMFMA language] in this case includes the Flying J[in] Mississippi [on] I-10 is yet to be definitively determined but at this stage it appears not to be such." The trial court also required Speedway to incorporate a 10-cent-per-gallon "cost-of-doing-business" charge into the price of all the diesel fuel it sold for a period of seven days. The trial court further held that at the end of the seven-day period, Speedway could *257 meet the price of a competitor, but the court restricted Speedway to competing with "local" truck stops, not the Gulfport Flying J. The court issued the preliminary injunction until a hearing on the merits could be held to definitively determine if, in fact, the Gulfport Flying J was a "competitor in the same market area" as the Speedway facility. Speedway appeals.

I.
We first set out our scope of review and why we believe Speedway's arguments are meritorious.
A preliminary injunction is reviewed under an abuse-of-discretion standard. TFT, Inc. v. Warning Systems, Inc., 751 So.2d 1238, 1241 (Ala.1999). We apply that standard of review to the facts presented in this case.
To sustain its argument that it was not violating the AMFMA, Speedway claims that although it was selling its diesel fuel "below cost," as that phrase is used in the AMFMA, it did so "in good faith to meet an equally low price of a competitor in the same market area," within the meaning of that phrase as it is used in § 8-22-8(b); that competitor, it contends, is the Gulfport Flying J. Consequently, Speedway argues that the trial court abused its discretion by issuing the preliminary injunction, given the testimony of three persons, namely Glenn Plumby, Dewey Clower, and Wayne Kittle, who each testified, in effect, that the Gulfport Flying J is within the same "market area" as the Satsuma Speedway truck stop. They stated that, based on the fuel range of essentially all long-haul trucks, any truck stop offering the same or similar amenities within a 100- to 200-mile-range along a route on the Interstate highway system would be operating in competition for the business of those long-haul trucks.
In support of its argument, Speedway cites Tennessean Truckstop, Inc. v. MAPCO Petroleum, Inc., 728 F.Supp. 489 (M.D.Tenn.1990). In Tennessean Truckstop, the plaintiff operated an independently owned truck stop adjacent to I-65 in Giles County, Tennessee. The defendant, Mapco Petroleum, Inc., operated a "Delta Express" truck stop at the same intersection. Mapco's truck stop sold diesel fuel at a price several cents per gallon lower than the plaintiff's truck stop. The plaintiff filed an action alleging a violation of the Tennessee Petroleum Trade Protection Act, an act similar to the AMFMA. Mapco presented evidence indicating that other truck stops within 200 miles of the intersection where its store was located sold diesel fuel at the same price or at lower prices. The federal district court held that the plaintiff's argument that the only market relevant to the lawsuit was the local market at the plaintiff's particular intersection ignored the "commercial realities" of the long-haul-trucking market. It held that the relevant geographic market area for the truck stops in that case extended up to 200 miles in either direction.
Phillips counters Speedway's argument by basically adopting the reasoning of the trial court's order granting the preliminary injunction, wherein the trial court stated that Speedway's claim that it was meeting the competition of the Gulfport Flying J was "tantamount to `manufacturing competition' for purposes of the AMFMA." Phillips contends that the trial court did not abuse its discretion in finding that Speedway was not in competition with the Gulfport Flying J, because the Flying J was located over 80 miles away and on a different Interstate highway. Phillips also points out that Speedway has another facility at the intersection of Moffett Road and I-65 and that that facility does not price its diesel fuel as low as the Satsuma Speedway facility does, although the Moffett *258 Road Speedway facility is closer to the Gulfport Flying J than the Satsuma Speedway facility is.

II.
Based on the information presented to the trial court at the hearing on the preliminary injunction, we agree with Speedway, and we conclude that the trial court abused its discretion in issuing the injunction. It appears to us that the Speedway facility that is the subject of this controversy was designed and geographically located to attract the long-haul-truck traffic along the I-65/I-10 freight lane, as evidenced by the size of the facility, its amenities, and the surveys conducted by Speedway. Furthermore, based on the facts of Tennessean Truckstop and the conclusions the court reached in that case, we conclude that the trial court's finding that Speedway was not in competition with the Gulfport Flying J, because the Flying J was located over 80 miles away and on a different Interstate highway, "ignores the commercial realities of the truck stop competitive market." See 728 F.Supp. at 490.
Our conclusion is buttressed by the testimony of the owner of Phillips. William J. Phillips testified that 75% of his facility's business consists of service provided to local truckers traveling Alabama Highway 43, and that the remaining 25% of the business is with truckers who depart I-65 to make deliveries to a local industrial park. Although there is some overlap in the competitive market of Speedway and Phillips for customers of diesel fuel, the Phillips facility does not target the same long-haul-truck traffic the Speedway facility targets. Speedway met its burden of showing that, although it was pricing its diesel fuel "below cost," it did so in good faith for the permissible purpose of "meeting [the] competition" of the Gulfport Flying J. Therefore, the trial court abused its discretion in issuing the injunction.
The judgment entering the injunction is reversed, and the cause is remanded for an order or proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOUSTON, COOK, SEE, LYONS, BROWN, JOHNSTONE, and ENGLAND, JJ., concur.
HOOPER, C.J., concurs specially.
HOOPER, Chief Justice (concurring specially).
I concur heartily, and I would add that I think the burden upon a plaintiff in a case like this is, and should be, especially high. What exactly is the plaintiff doing in this case? The plaintiff, Phillips, wants the civil government, the courts being one of the three branches of civil government, to exercise its power to coerce a legitimate concern doing business in the marketplace, by prohibiting that business from lowering the prices of its products. That action is an extraordinary interference in the activity of the free market, and it should receive extra careful review and require adequate justification. In looking for adequate justification, I would impose a high standard, perhaps even a standard requiring clear and convincing evidence, when a plaintiff tries to enforce a statute that infringes upon the freedom of the marketplace. The Alabama Constitution guarantees freedom from the improper coercion of the civil government, not from the competition and pressures of the marketplace. Therefore, I would expect, and demand, a higher standard of proof when the State steps in to "manage" the marketplace rather than accepting the natural management that exists in a free economy.
*259 Walter Williams, John M. Olin distinguished professor of economics at George Mason University, states:
"Private property performs at least two important social functions: it encourages people to do voluntarily what is in the social interest, and it minimizes the coercive power that one man or the state can have over another. And it performs these functions without appeals to beneficence."
Imprimis newsletter, Vol. 29, No. 8, p. 2 (August 2000). In other words, a person may own property and do what he wishes with it, but if he wants to profit from the use of that property, he must use it for the benefit of others. That is the freedom and the legitimate coercion of the market. It promotes freedom because it prevents unnatural interference of the state in the affairs of the people, an interference that can lead to totalitarianism because the "good will" of the state can become heavy-handed and arbitrary in its application of coercion, i.e., the force of the law. If my livelihood depends upon my satisfying a consumer, then any law requiring that I be fair or keep my prices low is at best superfluous, and at worst tyrannical.
Williams explained his position:
"The Founders understood that relatively free markets are the most effective form of social organization for promoting individual freedom. Indeed, capitalism is defined as a system wherein individuals are free to pursue their own interests, make voluntary exchanges, and hold private property rights in goods and services. Much of the original intent of the United States Constitution, as seen in the document itself and in the Federalist Papers that advocated its ratification, was to bring about a climate in which this kind of social organization could occur."
Id. What has been the logical progression of the "good intentions" of government intervention in the economy? Williams explains:
"Government was not long in the business of doing good before Americans found they could use government to live at the expense of other Americans, both through the tax code and through `privilege granting,' a government activity that dates back to medieval times in Europe, where guilds and mercantile associations controlled trade in their particular areas."
Id. at 3.
In this case, the trial court ruled in favor of a local corporation, owned by an Alabama resident, and against a large out-of-state corporate defendant. I am not arguing that the trial court was unfairly prejudiced against the defendant because that defendant is a foreign corporation. However, in certain cases in the courts of this State, there sometimes may have been a temptation to err on the side of "caution" and to rule in favor of a local resident. It also demonstrates the possibility of the state's "beneficence" becoming tyranny.
As a member of the judiciary, I cannot, should not, and do not disregard the laws passed by the Legislature; however, when a law impinges upon one's liberty to do business, and does so even for a "good cause," a plaintiff relying on that law and seeking an action as extraordinary as a court order fixing prices should be held to a high standard of proof and justification. I concur in Justice Maddox's opinion.
NOTES
[1] See Lowe v. Fulford, 442 So.2d 29, 33 (Ala. 1983) ("`Generally courts are reluctant to reach constitutional questions, and should not do so, if the merits of the case can be settled on non-constitutional grounds.... A court has a duty to avoid constitutional questions unless essential to the proper disposition of the case.'" (Citations omitted.)).