Rel: April 25, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2024-2025

————————————————

### CL-2024-0604

————————————————

## Alabama Department of Public Health and Scott Harris, M.D., in his official capacity as State Health Officer

### v.

## TSTL Holdings, LLC

### Appeal from Montgomery Circuit Court
### (CV-23-900643)

EDWARDS, Judge.

In July 2022, TSTL Holdings, LLC ("TSTL"), began manufacturing and distributing various foods containing cannabinoids found in

industrial hemp, as that term is defined in Ala. Code 1975, § 2-8-381(4).[1] In January 2023, after receiving a complaint that TSTL was manufacturing foods without a proper license from the Alabama Department of Public Health ("ADPH"), Rita Wagnon, the food-protection supervisor employed by the Etowah County Department of Health, visited TSTL's premises to perform an inspection. Wagnon explained to TSTL's personnel that ADPH had regulatory authority over the production of food in Alabama and that ADPH took the position that cannabinoids could not legally be added to food products in the State of Alabama. Shortly thereafter, on January 12, 2023, ADPH issued two separate food-condemnation orders notifying TSTL that it could not sell any and all food products that it had manufactured because its facility had not been properly permitted and because "[f]ood or food products containing cannabidiol or cannabidiol derivatives shall not be manufactured or sold within the state of Alabama." ADPH amended the food-condemnation order on March 13, 2023, to include as a basis for the order that "[f]ood or food products containing cannabidiol or cannabinoid

---

[1]Based on exhibits in the record on appeal, the foods containing cannabinoids manufactured by TSTL include lollipops, gummies, brownies, rice-cereal treats, chocolate bars, and honey.

2

derivatives shall not be manufactured or sold within the State of Alabama."

On May 15, 2024, TSTL commenced in the Montgomery Circuit Court ("the trial court") an action against ADPH and Scott Harris, M.D., in his official capacity as State Health Officer ("the SHO"), seeking a judgment declaring that ADPH did not possess the authority to regulate hemp products, including food, and requesting both a preliminary and a permanent injunction prohibiting ADPH and the SHO from condemning TSTL's food products based on the position of ADPH and the SHO that Alabama does not permit the addition of cannabidiol or cannabinoid derivatives to food.[2] The trial court entered a temporary restraining order requiring ADPH and the SHO to permit TSTL to continue to conduct its business pending resolution of the declaratory-judgment

---

[2]TSTL initially pursued its administrative remedies by filing an appeal to the State Board of Health from the January 2023 and the March 2023 food-condemnation orders. The food-condemnation orders were apparently upheld, but the trial court indicates in its judgment that "the administrative case was stayed." In any event, our supreme court has recognized an exception to the doctrine of the exhaustion of administrative remedies "'"[w]hen (a) the question raised is one of interpretation of a statute."'" LEAD Educ. Found. v. Alabama Educ. Ass'n, 290 So. 3d 778, 784 n.8 (Ala. 2019) (quoting City of Graysville v. Glenn, 46 So. 3d 925, 929 (Ala. 2010), quoting in turn Ex parte Lake Forest Prop. Owners' Ass'n, 603 So. 2d 1045, 1046-47 (Ala. 1992)).

action. On June 6, 2023, and February 24, 2024, the trial court held a trial regarding TSTL's claims.

After receiving posttrial briefs from the parties, the trial court entered a judgment on July 10, 2024, declaring that "the manufacture and sale of edible hemp products in Alabama is legal under the plain language of [the Alabama Industrial Hemp Research Program Act ('the Hemp Act'), Ala. Code 1975, § 2-8-380, et seq.,] and consistent with the intent of the Alabama legislature." Although the trial court recognized that ADPH "has regulatory authority over food manufactured and sold in Alabama pursuant to Ala. Code 1975, §§ 22-2-2, 22-10-1, et seq., 22-20-5 and implementing regulations," it concluded that ADPH lacked "the authority to adopt or implement regulations to prohibit the manufacture or sale of edible hemp products by Alabama companies or otherwise undermine the intent of the Legislature."[3] Moreover, the trial court opined that ADPH and the SHO "do[] not have the authority to deny [TSTL], or any other Alabama company, a permit based on the fact that [it is] manufacturing or selling food containing hemp as defined in the

---

[3]Notably, the regulations relied upon by the SHO were not recently adopted or implemented and had been in existence, in their most current form, since December 2014.

[Hemp] Act." Based on those conclusions, the trial court declared the January 2023 and March 2023 food-condemnation orders to be void and further ordered ADPH and the SHO to issue to TSTL "the permit or permits required to conduct its business." In addition, the trial court entered a permanent injunction enjoining ADPH and the SHO "from taking any action to prohibit Alabama companies from manufacturing or selling edible hemp products provided that they comply with the statutory definitions" and "from denying permits to any company solely based on the fact that [it is] seeking to manufacture or sell edible hemp products that comply with the statutory definitions."

ADPH and the SHO appealed the July 2024 judgment to the Alabama Supreme Court. Our supreme court transferred the appeal to this court, after that court concluded that, pursuant to Coprich v. Jones, [Ms. SC-2023-0675, June 21, 2024] ___ So. 3d ___ (Ala. 2024), this court was the appropriate appellate forum; the supreme court's transfer order also stated that, if this court were to determine that the amount in controversy exceeded the $50,000 monetary limit of this court's general civil appellate jurisdiction, this court must nonetheless hear the appeal pursuant to our supreme court's discretionary-transfer authority under

subsection (6) of Ala. Code 1975, § 12-2-7. In compliance with our supreme court's directives, see Ala. Code 1975, § 12-3-16, we proceed to consider the appeal.

We must first address a jurisdictional issue. Insofar as TSTL named ADPH as a defendant in its declaratory-judgment action, that action is barred by sovereign immunity. See Alabama Dep't of Transp. v. Harbert Int'l, Inc., 990 So. 2d 831, 841 (Ala. 2008) (explaining that state agencies are immune from suit and that "only State officers named in their official capacity -- and not State agencies -- may be defendants in [declaratory-judgment] proceedings"); Alabama Dep't of Public Health v. Noland Health Servs. Inc., 267 So. 3d 873, 875 (Ala. Civ. App. 2018) (declaring a judgment entered against the Alabama Department of Public Health was void and dismissing the appeal therefrom). Accordingly, insofar as the trial court's judgment purports to adjudicate TSTL's claims against ADPH or to issue an injunction against ADPH, that judgment is void; because a void judgment will not support an appeal, we dismiss ADPH's appeal. See Alabama Dep't of Public Health, 267 So. 3d at 875. We will consider the merits of the appeal brought by the SHO.

<u>The Positions of the Parties</u>

The SHO contends that ADPH possesses the authority to regulate food and food manufacturers. <u>See</u> Ala. Code 1975, § 22-20-5(a).[4] The SHO argues that, because ADPH has regulatory authority over the manufacture and sale of food products in Alabama pursuant to § 22-20-5(a), it is the sole arbiter of whether food may contain hemp or hemp derivatives like cannabinoids. The SHO points out that no federal or state law or regulation provides that cannabinoids are a safe food additive. According to the SHO, no food containing cannabinoids may be manufactured or sold in Alabama, and, thus, the SHO says, ADPH personnel properly condemned the food manufactured by TSTL as adulterated, as defined by Ala. Admin. Code (Dep't Pub. Health), r. 420-3-20.-01(3)(a).

---

[4]Section 22-20-5(a) provides, in pertinent part that

"[t]he State Committee on Public Health shall, as conditions demand, adopt and promulgate regulations for the construction, maintenance and operation of all establishments, and their immediate surroundings, in which foods or beverages intended for sale for human consumption are made, prepared, processed, displayed for sale in an unpackaged state or served."

TSTL, however, contends that, in Ala. Code 1975, § 2-8-381(3), the Alabama Legislature declared that food containing cannabinoids are "hemp products" and that, therefore, such products are legal. Further, TSTL posits, the Alabama Legislature expressed a desire to "commercializ[e] hemp products … to the greatest extent possible," Ala. Code 1975, § 2-8-382(a), and has also stated that "the development of industrial hemp production and commercial markets for hemp products within the state is important to the economic well-being of the state." Ala. Code 1975, § 2-8-382(b). Thus, TSTL says, ADPH personnel could not determine that the food produced by TSTL was adulterated and condemn it based on its containing cannabinoids. Further, TSTL argues that it should be permitted to continue to manufacture its products, all of which contain cannabinoids.

The Applicable Law

At issue are the statutes authorizing ADPH to regulate food production or manufacture in Alabama, Ala. Code 1975, § 22-2-2 and § 22-20-5. ADPH is authorized "[t]o adopt and promulgate rules and regulations providing proper methods and details for administering the health and quarantine laws of the state." § 22-2-2(6). In addition, ADPH

8

is further authorized to "adopt and promulgate regulations for the construction, maintenance and operation of all establishments, and their immediate surroundings, in which foods or beverages intended for sale for human consumption are made, prepared, processed, displayed for sale in an unpackaged state or served." § 22-20-5(a). To that end, ADPH has enacted regulations governing the permitting and inspection of establishments that manufacture or serve food and the examination of food manufactured therein. See, generally, Ala. Admin. Code (Dep't Pub. Health), r. 420-3-20-.01 et seq. ADPH's regulations define "food" as "any raw, cooked, or processed edible substance, ice, beverage or ingredient used or intended for use or for sale, in whole or in part, for human consumption, or chewing gum." Ala. Admin. Code (Dep't Pub. Health), r. 420-3-20-.01(3)(f). Those same regulations define "adulterated food" as

> "any food that bears or contains any poisonous or deleterious substance which may render it injurious to health; or if it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food; or if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health; or if it is otherwise defined as adulterated under § 402(A) of the Food, Drug, and Cosmetic Act (21 USC § 342)."

9

r. 420-3-20-.01(3)(a). Moreover, ADPH's regulations adopt by reference most of the regulations governing food for human consumption set out by the federal Food and Drug Administration ("FDA") in 21 C.F.R. 100 et seq. See Ala. Admin. Code (Dep't Pub. Health), r. 420-3-20-.02. Foods that are determined to be manufactured in violation of ADPH regulations may be condemned and ordered to be destroyed. See Ala. Code 1975, § 22-10-3; Ala. Admin. Code (Dep't Pub. Health), r. 420-3-20-.06.

Also central to the issues presented is the Hemp Act, which defines "industrial hemp" or "hemp" as

> "[t]he plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, cultivated or possessed by a licensed grower or otherwise in accordance with the state's USDA-approved regulatory plan, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis. Industrial hemp shall be considered an agricultural crop or an agricultural commodity, or both, in all respects under state law. The term excludes marijuana as defined in subdivision 14 of [Ala. Code 1975, §] 20-2-2."

§ 2-8-381(4). In addition, § 2-8-381(3) defines "hemp products" as "[a]ny and all products made from industrial hemp, including, but not limited to, cloth, cordage, fiber, food, fuel, paint, paper, particleboard, plastics,

seed, seed meal and seed oil for consumption, and seed for cultivation if the seeds originate from industrial hemp varieties."

The legislature set out the purposes of the Hemp Act in Ala. Code 1975, § 2-8-382:

"(a) The purpose of [the Hemp Act] is to assist Alabama in the development of a more permanent, profitable, and diversified agriculture by moving to the forefront of industrial hemp production, development, and commercialization of hemp products in agribusiness, and other business sectors, both nationally and globally and to the greatest extent possible. These purposes may be accomplished, in part, through all of the following:

"(1) An industrial hemp research program overseen by the [Alabama Department of Agriculture and Industries ('the department')], working exclusively or in conjunction with other research partners. This research program may include the planting, cultivation, and analysis of industrial hemp demonstration plots by selected growers that are licensed by the department pursuant to [the Hemp Act].

"(2) An institution of higher education's program to conduct industrial hemp research.[5]

"(3) The pursuit by the department or an institution of higher education of any federal permits or waivers necessary to allow industrial hemp to be grown in Alabama.

---

[5]The term "institution of higher education" is defined in Ala. Code 1975, § 2-8-381(5), as "[a] postsecondary institution, as defined in 20 U.S.C. § 1001(a), that offers a major course of study in agriculture issues."

"(b) The Legislature hereby finds and declares that the authority granted in this article and the purposes accomplished hereby are proper governmental and public purposes, and that the development of industrial hemp production and commercial markets for hemp products within the state is important to the economic well-being of the state."

In its last section, the Hemp Act grants the Alabama Department of Agriculture and Industries ("ADAI") the authority to adopt rules "as necessary to administer an industrial hemp research program and to license growers." Ala. Code 1975, § 2-8-383(a). The Hemp Act further requires ADAI to "coordinate the implementation of [the Hemp Act] with other state agencies or departments, as needed, to protect public safety … and create a commercial market for industrial hemp." § 2-8-383(d). Finally, the Hemp Act also requires ADAI, "in consultation with the Governor and Attorney General," to "develop a plan under which the state monitors and regulates the production of hemp." Ala. Code 1975, § 2-8-383(e). The term "hemp products" does not appear in § 2-8-383, and no provision in the Hemp Act provides ADAI the authority to adopt rules to regulate the manufacture or sale of "hemp products" or food containing cannabinoids.

## The Trial Court's Judgment

The trial court's judgment determined that ADPH personnel could regulate TSTL as they do other food manufacturers by inspecting and monitoring its facilities and processes. See r. 420-3-20-.01 et seq. and r. 420-3-22-.01 et seq. However, the trial court prohibited the SHO from declaring that, pursuant to ADPH regulations, foods containing cannabinoids were illegal in Alabama and from maintaining its position that such food could not, under any circumstances, be manufactured in this state. The trial court concluded that the legislature had clearly stated its intent to create a commercial market for hemp products in § 2-8-382(a) and that, based on the inclusion of the word "food" in the definition of "hemp products" in § 2-8-381(3), intended to legalize the manufacture and sale of foods containing hemp or hemp derivatives like cannabinoids, which are specifically included in the definition of the term "hemp." Based on that conclusion, the trial court also entered a permanent injunction enjoining the SHO "from taking any action to prohibit Alabama companies from manufacturing or selling edible hemp products provided that they comply with the statutory definitions" and "from denying permits to any company solely based on the fact that they

are seeking to manufacture or sell edible hemp products that comply with the statutory definitions." Finally, the trial court ordered the SHO to issue to TSTL a permit to manufacture food.

## Analysis

On appeal, the SHO first argues that the trial court erred in determining that the Hemp Act "impliedly repealed" ADPH's statutory authority to regulate food products. See Weathers v. City of Oxford, 895 So. 2d 305, 309 (Ala. Civ. App. 2004) (stating that "[r]epeal by implication is not favored in Alabama law"). According to the SHO, the trial court failed to harmonize the Hemp Act and the statutes and regulations granting ADPH the authority to regulate food products. See Weathers, 895 So. 2d at 310 (explaining that one of the rules of statutory construction is to "harmonize the provisions of separate acts as far as practicable"). The SHO contends that, although the legislature defined "hemp products" broadly to include "food" in the Hemp Act, the Hemp Act did not strip ADPH of its authority to regulate food or to declare that food

14

products cannot contain cannabinoids, which, it says, are not generally recognized as safe food additives by ADPH or by the FDA.[6]  We agree.

We begin our analysis by considering the well-known precepts of statutory construction.  Our construction of any statute begins with "the fundamental rule of statutory construction[, which] is to ascertain and give effect to the intent of the Legislature in enacting [that] statute." Norfolk S. Ry. Co. v. Johnson, 740 So. 2d 392, 396 (Ala. 1999); see also IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So. 2d 344, 346 (Ala. 1992).  We must, when possible, "gather the legislative intent from the language of the statute itself," but we may also consider "the reason and necessity for the act, and the purpose sought to be obtained by its passage." Johnson, 740 So. 2d at 396.  Of course, "words in a statute must be given their plain meaning." Mobile Infirmary Med. Ctr. v. Hodgen, 884 So. 2d 801, 814 (Ala. 2003).  When a "statute is ambiguous or

---

[6]Although TSTL presented evidence at trial indicating that the FDA has indicated that a new regulatory framework will be necessary to address access to and the use of hemp derivatives like cannabinoid, the SHO presented uncontroverted evidence indicating that, at the time of the trial, the FDA did not consider cannabinoid to be a safe food additive. The SHO also presented evidence indicating that hulled hemp seed, hemp-seed protein powder, and hemp-seed oil are considered to be safe food additives by the FDA.

uncertain, the court may consider conditions that might arise under the provisions of the statute and examine results that would flow from giving the language in question one particular meaning rather than another." Johnson, 740 So. 2d at 396.

"In interpreting statutory language, a court does not look at one word or one provision in isolation, but rather looks to a whole statutory scheme for clarification and contextual reference." USX Corp. v. Bradley, 881 So. 2d 421, 426 (Ala. Civ. App. 2003). A court construing a statute must consider "the entire statute … not just an isolated part, so that every clause is given effect in light of the subject matter and purpose of the law." Norandal USA, Inc. v. State Dep't of Revenue, 545 So. 2d 792, 793 (Ala. Civ. App. 1989). Courts also "'consider the statute as a whole and ... construe the statute reasonably so as to harmonize [its] provisions.'" Proctor v. Riley, 903 So. 2d 786, 789 (Ala. 2004) (quoting McRae v. Security Pac. Hous. Servs., Inc., 628 So. 2d 429, 432 (Ala. 1993)); see also Weathers, 895 So. 2d at 309 (quoting Ex parte Jackson, 625 So. 2d 425, 428 (Ala. 1992), quoting in turn 2A Norman J. Singer, Sutherland Statutory Construction § 46.05 (5th ed. 1993)) ("Additionally, '[s]ections of the Code originally constituting a single act must be read in

16

pari materia in order to "produce a harmonious whole."'"). We have explained that "the law favors rational and sensible construction," and we have further stated "that the Legislature intended a just and reasonable construction" of its enactments. Weathers, 895 So. 2d at 309. Therefore, "we will '"read the concept of reasonableness into the provisions of [a] statute."'" Weeks v. Herlong, 31 So. 3d 122, 125 (Ala. Civ. App. 2009) (quoting Smith v. Smith, 964 So. 2d 663, 670-71 (Ala. Civ. App. 2005), quoting in turn Ex parte Berryhill, 801 So. 2d 7, 10 (Ala. 2001)).

Moreover, "[t]he Legislature, when it enacts legislation, is presumed to have knowledge of existing law and of the judicial construction of existing statutes." Hodgen, 884 So. 2d at 814. When two statutes conflict, a court must "harmonize the provisions of separate acts as far as practical." Weathers, 895 So. 2d at 310. However, the principles of statutory construction "dictate[] that, in the event of a conflict between two statutes, the specific statute relating to a specific subject will prevail over the general statute relating to a broad subject." Id.; see also Ex parte Jones Mfg. Co., 589 So. 2d 208, 211 (Ala. 1991) (stating that "a specific

17

statute relating to a specific subject is regarded as an exception to, and will prevail over, a general statute relating to a broad subject").

In making its determination that the Hemp Act made food containing cannabinoids legal and therefore precluded the SHO from determining that such foods were adulterated and could not be manufactured in Alabama under ADPH regulations, the trial court focused on the inclusion of the word "food" in the definition of "hemp products" and on one of the stated purposes of the Hemp Act -- to develop a commercial market for hemp products. Certainly, as the trial court determined, the legislature expressly decided to include "food" as a "hemp product." However, reading the entirety of the Hemp Act results in the conclusion that the Hemp Act's intent was to create a hemp research program aimed at developing a market for industrial hemp and hemp products and not to authorize an open, unregulated market for food products containing industrial hemp, its derivatives, or cannabinoid.

Section 2-8-382(a) indicates that the purposes of the Hemp Act should be accomplished, "in part," through three specified methods: "[a]n industrial hemp research program to be overseen by [ADAI], working exclusively or in conjunction with other research partners," "[a]n

18

institution of higher education's program to conduct industrial hemp research," or "pursuit by [ADAI] or an institution of higher education of any federal permits or waivers necessary to allow industrial hemp to be grown in Alabama." The language of the Hemp Act indicates that the legislature authorized research into the growing of industrial hemp as an agricultural crop and the production of hemp products through a program administered by ADAI or through certain educational institutions in order to assist the state in developing commercial markets for industrial hemp and hemp products, not that it authorized private commercial ventures to begin the unregulated production of food containing hemp derivatives like cannabinoid. No language in the Hemp Act supports the conclusion that private, third-party commercial manufacturers are to develop a market for hemp products. The Hemp Act provides no means of regulating third-party manufacturers of any hemp products, much less food containing hemp derivatives or cannabinoids. Consistent with this reading of the Hemp Act, ADAI indicated at trial that it did not regulate manufacturers of hemp products of any sort and, more specifically, that it did not have a procedure for licensing or otherwise regulating manufacturers of food containing hemp derivatives or cannabinoids.

The trial court attempted to harmonize its determination that the Hemp Act legalized the placement of cannabinoids into food with ADPH's regulatory authority over food manufacturers by recognizing the right of ADPH personnel to permit and inspect TSTL's facilities pursuant to ADPH's authority under § 22-20-5(a) and its regulations. See Ala. Admin. Code (Dep't Pub. Health), r. 420-3-20-.04, r. 420-3-20-.05, and r. 420-3-22-.01 et seq. However, ADPH's regulatory scheme goes much further than making certain that the facilities that manufacture food meet sanitation standards. ADPH has been charged with the duty of ensuring the health and safety of the public through its regulatory authority over food manufacturers in the State of Alabama. § 22-20-5(a). To that end, ADPH has adopted the regulations promulgated by the FDA, including regulations governing food additives. r. 420-3-20-.02. Neither ADPH nor the FDA recognize cannabinoids as safe food additives. ADPH's regulations permit it to determine whether a food complies with ADPH regulations or is adulterated, Ala. Admin. Code (Dep't Pub. Health), r. 420-3-20-.06.

TSTL argues that the Hemp Act is the more specific act, legalizes cannabinoids in food, and therefore must necessarily displace ADPH's

more general regulatory authority over "food" in regard to food containing hemp derivatives like cannabinoid. We disagree. Although hemp products can include food, as the SHO contends, food remains food regardless of its designation as a hemp product. The Hemp Act legalizes industrial hemp and recognizes that hemp products might include food containing hemp, its derivatives, or cannabinoids, but the Act does not contain any specific provisions providing that food containing hemp derivatives or cannabinoids is not also food that would be subject to the same regulations as every other food manufactured in Alabama. In fact, nothing in the Hemp Act provides any authority for the regulation of food products containing hemp by ADAI or any other state agency. Instead, the Hemp Act requires ADAI to "coordinate the implementation of [the Hemp Act] with other state agencies or departments, as needed, to[, among other things,] protect public safety," § 2-8-383(d), which supports the conclusion that, in fact, ADPH retains its authority to regulate food containing any hemp derivatives to protect public health and safety.

Because ADPH is given the authority to "adopt and promulgate rules and regulations providing proper methods and details for administering the health and quarantine laws of the state," § 22-2-2(6),

and the ability to regulate the manufacture of food, § 22-20-5(a), TSTL argues that the statutes governing ADPH are more general than the Hemp Act. However, ADPH is granted the specific authority to determine whether "unwholesome … food or foodstuffs" are a public nuisance based on their being, or the likelihood of their becoming, "menaces to public health," Ala. Code 1975, § 22-10-1(4), and the authority to destroy such food or foodstuffs. Ala. Code 1975, § 22-10-3.[7] Based on that authority, ADPH has developed regulations relating to the manufacture of food and has adopted most of the food regulations promulgated by the FDA, none of which authorizes the addition of cannabinoids to food. The legislature is presumed to have been aware of

---

[7]Section 22-10-3, Ala. Code 1975, reads, in pertinent part:

"When such nuisance consists of … unwholesome … foods or foodstuffs … or beverages …. and which nuisance, in the opinion of the county board of health, should be abated by destroying rather than curing, cleansing or disinfecting the … thing or material involved … the county board of health shall, if after a careful investigation of the facts it considers such a course necessary for the protection of the public health, adjudicate such … things or material involved … to be such nuisance and order its summary destruction without compensation to the owner thereof; and thereupon, the county health officer shall proceed with such destruction in such manner as reasonably to avoid danger of infection."

ADPH's regulatory authority over food and its regulations regarding adulterated food and unsafe food additives. The Hemp Act specifically creates an industrial hemp research program, part of which includes the development of a market for hemp products, including food, but the Hemp Act does not specifically create such a market or provide in any way for the regulation of food products containing hemp, its derivatives, or cannabinoid; in fact, the Hemp Act appears to recognize the need for ADAI to coordinate with other state agencies, like ADPH, to ensure public safety. § 2-8-383(d). Thus, the Hemp Act is not a more specific statute relating to the regulation of food such that it should be determined to have displaced ADPH's regulatory authority over the safety of the manufacture of food for consumption by the citizens of Alabama.

The risk to public health that may arise from the unregulated introduction of cannabinoids into food should not be lightly considered. The Hemp Act authorizes research of the uses of industrial hemp, but no research on the use of cannabinoids as additives in food was provided to the trial court. The Hemp Act authorizes ADAI to enact regulations "to administer an industrial hemp research program and to license growers

23

to grow industrial hemp." § 2-8-383. No language in the Hemp Act authorizes ADAI or any other agency to develop regulations regarding the use of hemp in any of the enumerated hemp products, much less the use of hemp derivatives like cannabinoid in food for human consumption. TSTL apparently contends that the legislature has legalized the use of hemp and its derivatives, like cannabinoids, in food without reservation and without providing any form of oversight or regulation of such food products before they are sold to Alabama citizens. That is an unreasonable construction of the Hemp Act.

TSTL has requested that an Alabama court declare that food containing cannabinoids as an additive are legal in this state and that ADPH cannot prohibit their manufacture. Based on our understanding of the statutes involved, we cannot do so. TSTL is not part of any "industrial hemp research program" administered by ADAI or by any qualifying educational institution and therefore has no authority to assist in the establishment of any market for hemp products or for food products containing hemp derivatives or cannabinoids. Moreover, ADPH retains the authority to regulate the manufacture of food in this state, including the authority to determine whether particular food additives

24

are safe for human consumption. Accordingly, we reverse the judgment of the trial court, and we remand the cause to the trial court for the entry of a judgment consistent with this opinion.[8]

APPEAL DISMISSED IN PART; REVERSED AND REMANDED WITH INSTRUCTIONS.

Moore, P.J., and Hanson, J., concur.

Fridy, J., concurs specially, with opinion.

Lewis, J., concurs in the result, without opinion.

---

[8]Having concluded that, pursuant to ADPH's regulations, ADPH personnel may regulate the production of food containing hemp derivatives or cannabinoids, even to the point of declaring that they may not be manufactured in the state, we need not separately consider the propriety of the trial court's entry of a permanent injunction prohibiting the SHO "from taking any action to prohibit Alabama companies from manufacturing or selling edible hemp products provided that they comply with the statutory definitions" and "from denying permits to any company solely based on the fact that they are seeking to manufacture or sell edible hemp products that comply with the statutory definitions" or its order directing the SHO to issue to TSTL a permit to manufacture food. Those orders flowed from the determination that ADPH could not regulate food containing cannabinoids or declare food containing cannabinoid to be illegal, and, in light of our decision, are therefore no longer legally sustainable. See Walden v. ES Capital, LLC, 89 So. 3d 90, 105 (Ala. 2011) (quoting TFT, Inc. v. Warning Sys., Inc., 751 So. 2d 1238, 1242 (Ala. 1999), overruled on other grounds, Holiday Isle, LLC v. Adkins, 12 So. 3d 1173 (Ala. 2008)) (stating that, in order to establish entitlement "'to a permanent injunction, a plaintiff must demonstrate success on the merits'").

FRIDY, Judge, concurring specially.

I believe that the main opinion faithfully applies the rules of statutory construction as laid down by our supreme court and that it reaches the proper outcome. Thus, I concur. I write specially to express my hope that our supreme court will reconsider, at some point, its adoption of one of the rules of statutory construction expressed in the main opinion, namely, that a court should begin the task of interpreting a statute by trying to ascertain and effectuate the Legislature's "intent" in enacting the statute.

Justice Mitchell, in a dissenting opinion, wrote that "it is never [a court]'s task to determine legislative intent." Ex parte N.G., 321 So. 3d 655, 661 (Ala. 2020) (Mitchell, J., dissenting). I agree with him, for three simple reasons: (1) there is no way to determine what each member of the Legislature understood to be the meaning of a bill, (2) there is no way to determine what each member of the Legislature believed to be the purpose of a bill, and (3) there is no such thing as a collective "intention" among 145 legislators -- all of whom represent different constituents, are spread over two houses, and are voting at two different times following two different presentations by two different members on the floors of two

26

different chambers. See, generally, Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts at 391-96 (Thomson/West 2012) (noting, among other things, "that references to intent have led to more poor interpretations than any other phenomenon in judicial decision-making").

If a bill passes and becomes a law, the actual words of the statute are the only things about which we can be sure that at least a majority of the members of the Legislature agreed. The meaning of those agreed-upon words -- not the intentions of those who agreed upon them -- should be the only thing we are tasked with ascertaining. And, the tools for accomplishing the task of ascertainment should not involve an attempt to discern what those legislators who voted in favor of the bill, many of whom may have had very different understandings of the bill, were thinking at the time they voted for it. In short, "[t]he use of the term legislative intent encourages [the] search for the nonexistent," id. at 394, and I encourage our supreme court to excise from our caselaw any directive that requires courts to engage in that search when considering the meaning of a statute.